# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GARY SPARAGO,

                             Plaintiff,

           - against –

BEAVER MOUNTAIN LOG HOMES, INC.,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 20 Civ. 276 (KMK)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Gary Sparago, by his attorneys Brick Law PLLC, as and for his amended

complaint against defendant Beaver Mountain Log Homes, Inc. ("Beaver Mountain" or

"Defendant") herein alleges as follows:

## NATURE OF THE ACTION

1.      Beaver Mountain repeatedly tells its customers and the public:  "We're with you

every step of the way."  Beaver Mountain says this on its website, in its printed promotional

materials, and in other documents.

2.      "We're with you every step of the way" seems to be one of Beaver Mountain's

premier catch-phrases – to assure its customers and potential customers that Beaver Mountain

will be there to take care of their needs wherever they are in the process of planning and building

a Beaver Mountain log cabin home.

3.      In fact, on the "Get Started" tab of its website under the sub-heading "Our

Design/Build Process," Beaver Mountain explains:

        Here at Beaver Mountain, we wake up every day and work tirelessly to make sure
        our customers enjoy the finest possible home building experience – before,

<u>during, and after their projects are completed</u>.  For us, it's this simple:  your quality of life is our highest priority.  As our team fully understands that building a new log home adds one more thing to your already busy schedule, <u>we leverage our expertise and experience so you can involve yourself in the process as much or as little as you want, knowing we always have your back</u>.  We deliver <u>unparalleled service during the design and building phases</u>, and reliable support after you move in.  Additionally, as we probably like surprises even less than you do, we promise transparency, honesty, and communication…always!

(https://beavermtn.com/get-started/) (emphasis added).

   4. Beaver Mountain's printed promotional materials assure potential customers:

"You have probably imagined your new log/timber home many times over the years . . .DON'T

JUST DREAM ABOUT IT . . . LET US HELP YOU DESIGN & <u>BUILD</u> IT!" (capitalization in

original; underline added).

   5. Beaver Mountain lures its customers with promises that Beaver Mountain will

take care of everything in the design and building process ("every step of the way").  Customers

are assured that they can relax while Beaver Mountain leverages its expertise to produce log

cabin homes that they can enjoy – without adding to the burdens of their already-busy lives.

   6. The only problem with this otherwise warming message of reassurance is that it is

apparently false.

   7. In reality, while Beaver Mountain hand-holds its customers through the planning

and design process, and then through the process of selecting a contractor, Beaver Mountain then

has its customers sign a Purchase Agreement – many steps into the ten-step overall process

described on Beaver Mountain's website – that quietly tries to change the status between Beaver

Mountain and its customers.

   8. More specifically – and located in Paragraph 10 in the middle of the pre-printed

terms on the reverse side of the Purchase Agreement – Beaver Mountain's Purchase Agreement

includes the following:

- THE PURCHASER ACKNOWLEDGES THAT THE SELLER IS A SUPPLIER OF MATERIALS ONLY.

- All responsibility of materials from the Seller ends on delivery in good condition of materials listed in this Purchase Agreement.

- The seller assumes no responsibility for erection or proper installation of materials . . .

- <u>The Purchaser also acknowledges that they are solely responsible for the selection of the contractor(s).</u>

- The Seller is not responsible for the quality of the contractor(s)' work.

(Purchase Agreement ¶ 10) (capitalization in original; underline added) (copy annexed hereto as Exhibit 1.)

9. While Beaver Mountain promises its customers to be there "every step of the way," it has its customers sign the Purchase Agreement stating that Beaver Mountain is nothing more than a seller of materials and is <u>not</u> responsible for anything it describes on its website that it does to help customers "every step of the way."

10. Beaver Mountain touts how much it detests surprises by promising "transparency, honesty, and communication…always" – but there was <u>no</u> transparency, honesty, or communication when Beaver Mountain quietly had customers like Mr. Sparago sign the Purchase Agreement well into their projects. Beaver Mountain certainly did not point out the provisions quoted above, and it certainly did not tell Mr. Sparago that the Purchase Agreement contained provisions aimed to eliminate Beaver Mountain's responsibility.

11. And, should a problem later arise with the contractor selected to build the Beaver Mountain home, Beaver Mountain then steps back and hides behind Paragraph 10 of the Purchase Agreement – just as it has done here with Mr. Sparago. Beaver Mountain relies on Paragraph 10 as a defense – insisting that "Section 10 of the Purchase Agreement disclaims any

role other than as a supplier of materials and makes clear that Sparago is responsible for the selection of his builder."  (ECF Doc. No. 7.)

12.     After having told Mr. Sparago (and all of its other customers) that it would be there "every step of the way," Beaver Mountain instead has deflected responsibility and claims now that it was just a seller of the materials used to build Mr. Sparago's log cabin addition. Beaver Mountain has its customers sign the Purchase Agreement, which purports to let Beaver Mountain evade responsibility for the very selection process that Beaver Mountain just led for its customers.

13.     Broadly described, Beaver Mountain has been engaged in a classic "bait and switch" that falls squarely within the prohibitions of New York's consumer Deceptive Practices Act (General Business Law Section 349).  Beaver Mountain advertises itself as there for its customers "every step of the way," but then it quietly has its customers sign a Purchase Agreement that tries to change that dramatically (all without a shred of the "transparency, honesty, and communication" that Beaver Mountain insists are a part of its core practices).

14.     The deceptive practices that Mr. Sparago encountered (but did not discover until recently) extend beyond Mr. Sparago to all of Beaver Mountain's customers who signed a Purchase Agreement containing language buried on the reverse side of the document like the provisions contained in Paragraph 10.  Beaver Mountain's deceptive conduct is consumer-oriented and is therefore governed by General Business Law Section 349.

15.     Beyond Beaver Mountain's deceptive consumer practices, this action also seeks to remedy Beaver Mountain's specific acts of negligence and its omissions related to Mr. Sparago's construction of an addition at the premises he owns located at 134 Seeman Road, Neversink, New York (the "Premises").

16.     In 2017, during Beaver Mountain's coordination of the bidding process to select a project builder, Beaver Mountain recommended Robert Beechel from R&L Builders as a builder.

17.     Even though Beaver Mountain and its employees knew that other customers had complained about Robert Beechel and his work, Beaver Mountain did not share its knowledge about Robert Beechel with Mr. Sparago.  And, Mr. Sparago had specifically asked if there were prior issues or concerns about Robert Beechel at the time Mr. Sparago was considering Robert Beechel to build the log cabin addition.

18.     In reliance on (i) Beaver Mountain's positive recommendation about Robert Beechel, and (ii) Beaver Mountain's omission of material information concerning prior complaints that other Beaver Mountain customers had lodged against Robert Beechel, Mr. Sparago hired Robert Beechel and R&L Builders in early 2018 to build the addition at the Premises.

19.     Robert Beechel and R&L Builders then completely botched the construction work at the Premises – such that the defective construction and property damage is still being fixed or remediated.

20.     Mr. Sparago paid approximately $170,000 to Robert Beechel and R&L Builders, and Mr. Sparago has spent at least an additional $115,000 for other professionals and contractors to fix Robert Beechel's sub-par work (with an additional $15,000 expected to be required for work that has not yet been done but which is needed to fix the remaining items and issues stemming from Defendants' defective construction).

21.     All of this would have been avoided had Beaver Mountain shared what it knew about Robert Beechel instead of giving him a positive recommendation to Mr. Sparago and omitting the negative information it knew and that Mr. Sparago had requested.

22.     And, what Beaver Mountain knew is important because Beaver Mountain describes itself as the experts "every step of the way" and manages the entire design and construction project as the project manager.

23.     Beaver Mountain also tells its customers:  "Our professional consultants, designers and craftsmen will work closely with you through the design and build of your new home.  We will create your custom home conceptual drawings, define turnkey estimate ranges, provide a building timeline, help locate and recruit builder candidates, conduct builder introductions and solicit competitive bids for your home construction."

24.     And, Beaver Mountain continues:  "Your Beaver Mountain Project Manager will then develop a Builder Bid Analysis and Project Summary that we will use to help you interpret and compare various proposals to help finalize your building plans."

25.     There is no question that Beaver Mountain touts itself as having the expertise and of using that expertise to oversee the project from start to finish.

26.     But were there any such doubt nonetheless, Beaver Mountain's 2019 holiday card would eliminate that doubt by assuring its customers in the second paragraph:  "Our family doesn't end there though.  It includes the Beaver Mountain family – our team of carefully chosen experts who will be there for you every step of the way – and you" (emphasis added).

27.     Beaver Mountain tells its customers that it will make sure everything with their construction project runs smoothly and that Beaver Mountain will always be there to assist.

28.     When Robert Beechel bungled the construction work and then failed to reimburse Mr. Sparago for unused materials and work he did not actually perform, Beaver Mountain facilitated a meeting on May 29, 2019 among Beaver Mountain, Mr. Sparago, and Robert

Beechel – at which Robert Beechel agreed to reimburse Mr. Sparago for certain services not performed and certain materials not delivered.

29.     Beaver Mountain never would have been involved in a meeting like this and never would have facilitated such a meeting if Beaver Mountain were not the project manager and were not overseeing the entirety of Mr. Sparago's construction project at the Premises.

30.     Instead, it is clear that Beaver Mountain oversaw Mr. Sparago's construction project at the Premises and is responsible for misleading Mr. Sparago with a positive recommendation of Robert Beechel.

31.     And, when Beaver Mountain later made a site visit to the Premises in December 2018 to address Mr. Sparago's concerns with Robert Beechel's work, Beaver Mountain sent Mr. Sparago photos that falsely led him to believe the construction work was on track even though it was not.

32.     Beaver Mountain's Chris Weyer (a regional sales manager) sent a December 19, 2018 email to Mr. Sparago praising that the "[c]arpentry looked good.  Plumber was roughing in plumbing, and had a couple of guys working on siding . . . Looks great!"

33.     Beaver Mountain misled Mr. Sparago with photographs and false information that the construction project was being handled properly, and Mr. Sparago relied on Beaver Mountain's continued misrepresentations.

34.     Beaver Mountain should be held accountable – both for (i) having omitting negative information about Robert Beechel in response to Mr. Sparago's specific questions during the builder selection process, and for (ii) its deceptive consumer-oriented practices stemming from the terms of the Purchase Agreement that pull the proverbial rug from

underneath its customers' feet despite Beaver Mountain's repeated promises to be reliable solid ground "every step of the way."

## PARTIES

35.     Plaintiff Gary Sparago is a citizen of the State of New Jersey.

36.     Defendant Beaver Mountain Log Homes, Inc. is a business corporation organized and existing under the laws of the State of New York with a principal place of business located in Deposit, New York.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

38.     This Court has personal jurisdiction over Defendant Beaver Mountain Log Homes, Inc. pursuant to Rule 4(k) of the Federal Rules of Civil Procedure and Sections 301 and 302 of the New York Civil Practice Law and Rules because it is a New York business corporation, its conduct as alleged herein occurred within the State of New York, and it has transacted business within the State of New York related to the claims in this action.

39.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

A.    **Beaver Mountain Explains How It Helps
      Its Customers "Every Step Of The Way"**

40.    As Beaver Mountain's website describes, there are ten stages of its "Proprietary

DESIGN/BUILD PROCESS":  Step 1 (The Introduction), Step 2 (The Consultation), Step 3

(Refining the Design), Step 4 (Selecting a Builder and Exploring Financing), Step 5 (Creating a

Comprehensive Bid Analysis), Step 6 (Nailing Down the Final Details), Step 7 (Generating

Professional Construction Drawings), Step 8 (Preparing the Building Site), Step 9 (The

Construction Phase Kicks Off), and Step 10 (It's Time to Celebrate Moving Day!).  (*See*

https://beavermtn.com/get-started/).

41.    Beaver Mountain explains in the introduction to its ten steps that "[a]s our team

fully understands that building a new log home adds one more thing to your already busy

schedule, we leverage our expertise and experience so you can involve yourself in the process as

much or as little as you want, knowing we always have your back.  We deliver unparalleled

service during the design **and building phases**, and reliable support after you move in."

(https://beavermtn.com/get-started/) (emphasis added).

42.    Step Three (REFINING THE DESIGN) notes that Beaver Mountain will

"generate professional, ¼" scale drawings that can be used for financing applications, builder

bids, landscaping bids, and interior design planning."  (*Id.*)

43.    Step Four (SELECTING A BUILDER AND EXPLORING FINANCING")

explains that "[s]ome of our customers come to us with a Builder already in mind.  Others prefer

we offer suggestions based on our decades of experience with Builders in your area.  Rely on us

to schedule introductions, meet with you and potential Builders, and even introduce you to

reputable financing sources."  (https://beavermtn.com/get-started/) (emphasis added).

9

44.     Step Five (CREATING A COMPREHENSIVE BID ANALYSIS) tells customers:  "It's now time for your Building Consultant to develop a detailed bid analysis for your review, clarify the project scope, review cost estimates, and propose a construction schedule."  (*Id*.)

45.     Step Six (NAILING DOWN THE FINAL DETAILS) explains that "[a]fter you review and authorize the final home design/plans and approve the budget, we'll generate a complete material specifications list, and lock in your construction schedule.  Plus, we'll help you hire your chosen Builder and secure any necessary financing."  (*Id*.) (emphasis added).

46.     Step Seven promises Beaver Mountain's development of "construction, assembly, and detail drawings – complete with an Architect Stamp – to comply with permits and building requirements, and then begin manufacturing the components."  (*Id*.)

47.     Step Eight (PREPARING THE BUILDING SITE) "is the point at which your Builder will start clearing the site, excavating, grading, compacting, setting the footers, and pouring the foundation. When you visit, the progress will be visible!"  (*Id*.)

48.     Step Nine (THE CONSTRUCTION PHASE KICKS OFF) reminds customers that "[o]nce Beaver Mountain delivers your materials to the site, construction will get underway. Throughout the process, your Builder can rely on us for expert technical assistance and support." (*Id*.) (emphasis added).

49.     Finally, Step Ten reminds customers that even after the construction is completed and ready for occupancy, "[d]uring this hectic and exciting time, we're still 100% on your side!" (*Id*.)

50.     Together, these advertised ten steps detail to customers how Beaver Mountain is involved "every step of the way" during both the planning and the building processes.

10

51.     Throughout its website, Beaver Mountain also explains how it matches customers with builders and how it manages the process of helping customers obtain a builder to construct the designs Beaver Mountain and the customer create.

52.     In its "Frequently Asked Questions" page of its website, Beaver Mountain answers the question "How does Beaver Mountain help with the Design and Build of my home?" by explaining:

> "A.  When you're ready to build the home of your dreams, our caring, professional designers, consultants, and craftsmen will work directly with you to guide you through the design and build of your custom-built log cabin home, cedar home, or timber frame home. We will conduct an on-site evaluation, create your custom home design, define turnkey estimate ranges, provide a building timeline, conduct builder introductions and develop a builder bid analysis that we will use to help you define your total investment and building schedule for your custom home."

(https://beavermtn.com/faqs/#1538054546547-5ec84f49-8788) (emphasis added).

53.     Beaver Mountain answers the question "Q. Can I build an addition onto a log home?" by noting:

> "A.  Yes.  Additions, sunrooms, outdoor living areas, attached garages, and complete makeovers are possible and we build them often.  First, you'll connect with a Beaver Mountain Building Consultant to review your ideas and plans, then meet at your home to gather the information we need to generate conceptual drawings and estimate ranges.  We will create your custom design, provide a building timeline, help locate and recruit builder candidates, conduct builder introductions, and solicit competitive bids for your custom home construction.  Your Beaver Mountain Project Manager will then develop a Builder Bid Analysis and Project Summary that we'll use to help you interpret and compare the various proposals."

(https://beavermtn.com/faqs/#1538054580827-f0960e64-158f) (emphasis added).

54.     Beaver Mountain also describes its "Network of Professional Builders" by noting:

> "Based on our decades of experience and with the help of our extensive "Network of Industry Professionals," Beaver Mountain will locate and recruit professional builder candidates, local to our clients building site.  We will coordinate and conduct builder introductions and assist with soliciting builder bids.  Our experienced staff will help finalize the building plans and help take the next steps with the selected builder.

> Typically our clients will contract with Beaver Mountain Log Homes for the design and productions phase and with the builder for the construction phase."

(https://beavermtn.com/builders-corner/) (emphasis added).

55.     As Beaver Mountain makes clear, it immerses itself in the process through which its customers find and select builders.  Beaver Mountain tells its customers it has a network of reliable builders to match with customers and provides itself as a resource to customers' builders during the construction process.

56.     But, nothing in any of Beaver Mountain's detailed ten steps or anywhere else on Beaver Mountain's website or in its printed promotional materials provides any indication to a customer that Beaver Mountain later will claim it is merely a supplier of materials when a contractor's work on a Beaver Mountain home is sub-par (based on limiting language in a Purchase Agreement that Beaver Mountain has its customers sign during Step Five or Step Six well after they have spent time and paid money to Beaver Mountain during the design and planning process).

**B.     Beaver Mountain's "Bait and Switch" When Customers Sign
         A Purchase Agreement During Step Five Or Step Six Quietly
         Stating Beaver Mountain Is Merely A Supplier of Materials**

57.     Notwithstanding all of Beaver Mountain's consumer-oriented promotional materials and its assurances to customers that it is with its customers "every step of the way" to handle their needs during the design <u>and building</u> phases, Beaver Mountain has its customers sign a Purchase Agreement well into the ten-step process that tries to change Beaver Mountain into a supplier of materials only.

58.     The Purchase Agreement (Exhibit 1) contains a series of boilerplate terms on the reverse side of the page (in a font smaller than 10-point), which begins by stating that "This

Purchase Agreement is not final and binding until it is accepted by and signed on behalf of Beaver Mountain by authorized personnel." (Exh. 1 ¶ 1, reverse-side terms.)

59.     (In the Purchase Agreement, Beaver Mountain is the "Seller" and the customer is the "Purchaser.")

60.     In Paragraph 10, the Purchase Agreement recites that "THE PURCHASER ACKNOWLEDGES THAT THE SELLER IS A SUPPLIER OF MATERIALS ONLY." (Exh. 1 ¶ 10) (capitalization in original). Paragraph 10 also provides that "All responsibility of materials from the Seller ends on delivery in good condition of materials listed in this Purchase Agreement." (*Id*.)

61.     Paragraph 10 continues that "The seller assumes no responsibility for erection or proper installation of materials" and that "The Seller is not responsible for the quality of the contractor(s)' work." (*Id*.)

62.     Critically, Paragraph 10 also contains a provision that "<u>The Purchaser also acknowledges that they are *[sic]* solely responsible for the selection of the contractor(s)</u>." (*Id*.) (emphasis added).

63.     Casually presented to the customer as the document to order the materials for the construction of the log cabin, Beaver Mountain does not point out to its customers these important terms on the reverse side of the page. Nor does Beaver Mountain explain to its customers that by signing the Purchase Agreement in the middle of the process, Beaver Mountain is changing its status as the project manager there with you "every step of the way" to a supplier of materials only that will point the finger elsewhere if something goes wrong.

64.     Even though Beaver Mountain tells is customers:

- "Rely on us to schedule [builder] introductions, meet with you and potential builders" (Step Four);

- "Plus, we'll help you hire your chosen Builder" (Step Six);

- "Throughout the process, your Builder can rely on us for expert technical assistance and support" (Step Nine);

- "Beaver Mountain will locate and recruit professional builder candidates, local to our clients building site" (Builders Corner);

- "We will coordinate and conduct builder introductions and assist with soliciting builder bids" (Builders Corner); and

- "As our team fully understands that building a new log home adds one more thing to your already busy schedule, we leverage our expertise and experience so you can involve yourself in the process as much or as little as you want, knowing we always have your back" (Design/Build Process);

the reality that Beaver Mountain practices is completely different when a customer later tries to take Beaver Mountain up on its promise to be there "every step of the way."

65.     Instead (as it has done here with Mr. Sparago), Beaver Mountain hides behind Paragraph 10 of the Purchase Agreement directly in contrast with all of its consumer-oriented promises that Beaver Mountain "always" has its customers' backs.

66.     This is deceptive consumer-oriented conduct that General Business Law Section 349 was designed to address.  Beaver Mountain's "bait and switch" practice violates the mandates of Section 349 that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  (*See* N.Y. Gen. Bus. L. § 349(a).)

**C.     The Planning And Design Stages Of Mr. Sparago's Log Cabin Addition**

67.     In 2015, Mr. Sparago turned to Beaver Mountain to build an addition to his existing log cabin home.  According to a Beaver Mountain-generated "Project Time Line," the Design Consultation-Design Process began on November 6, 2015.  (Copy annexed hereto as Exhibit 2.)

68.    Interestingly, Beaver Mountain's Project Time Line contained as a fifth bullet point "Order Home, <u>Purchase Agreement</u>, next payment" slated to occur December 15 2017 (more than two years after the design process began.  (Exh. 2, 5th bullet point) (emphasis added).

69.    The timing of the Purchase Agreement is noteworthy because it is <u>preceded</u> by an earlier bullet point "<u>Builder Selections</u> and Select Financing" that was estimated to occur "Between 11/1/17-11/15/17" – <u>before</u> the signing of the Purchase Agreement in which Beaver Mountain has its customers agree that Beaver Mountain is not responsible for the selection of the contractor.  (Exh. 2, 3rd bullet point) (emphasis added)

70.    In other words, Beaver Mountain spearheads the builder selection process and guides its customers with its expertise in this area but then has them sign a Purchase Agreement providing that Beaver Mountain is not responsible for the very selection process that Beaver Mountain just completed (and spearheaded) for its customers.

71.    But, the relationship between Beaver Mountain and Mr. Sparago did not begin with the Purchase Agreement (which was not signed until two years <u>after</u> Beaver Mountain and Mr. Sparago worked to design the log cabin addition).  Instead, Mr. Sparago spent two years planning and refining the designs for the log cabin addition, with the parties' relationship beginning in November 2015.

72.    Various "Review Summary" reports that Beaver Mountain created and sent to Mr. Sparago projected "Builder Introductory meeting(s) on Site – BMLCH / CW" to occur in "Early-Mid November).  ("BMLCH" stands for Beaver Mountain Log & Cedar Homes, and "CW" stands for Chris Weyer, Beaver Mountain's Regional Building Consultant.)

73.    In addition, Mr. Sparago made several payments to Beaver Mountain during the two-year planning and design process, which are reflected by payment receipts Beaver Mountain

issued to Mr. Sparago – payments toward both the planning and construction materials to be used for the log cabin addition.

74. In a September 9, 2015 email, Chris Weyer wrote to Mr. Sparago: "As we discussed, we will meet you on Fri. Nov. 6th @ 10: 30am in Neversink to conduct the site assessment and gather additional information in order to aid the conceptual drawings & project planning. The $3500 retainer (check or credit card) can be provided at that time. Again, these funds will be applied to the BMLCH materials package."

75. A Beaver Mountain-created "Sparago Site Visit Summary – November 6, 2015" contains the following bullet point: "Discussed builder candidates – Max Dutcher, etc." indicating that Beaver Mountain discussed potential builders with Mr. Sparago early on in the parties' relationship.

76. A Beaver Mountain-created "Sparago Design Review Summary – December 11, 2015" similarly noted: "Discussed builder introductions and next step(s) based on a Spring 2017 time frame."

77. In other words, in November and December 2015, Beaver Mountain discussed builder introductions and specific contractors with Mr. Sparago even though it would later claim to be merely a supplier of materials not at all responsible for the selection of a builder.

78. Then in November and December 2017 (as detailed below in the following section), Beaver Mountain worked extensively with Mr. Sparago to coordinate and to manage the builder selection process – which ended with Beaver Mountain's favorable recommendation of Robert Beechel and his company R&L Builders.

79. Of course, while all of this takes place, the customer has yet to see a copy of the Purchase Agreement that contains the limiting language Beaver Mountain now points to in

defense.  Here, Beaver Mountain did not send Mr. Sparago a copy of the Purchase Agreement until December 2017, which Beaver Mountain countersigned on December 22, 2017.  (Exh. 1.)

**D.**     **Beaver Mountain Pairs Its Customers With Its Network Of Builders**

80.     In a July 20, 2017 email from Chris Weyer to Mr. Sparago, Mr. Weyer tried to push Mr. Sparago to move forward with his building plans sooner.  Mr. Weyer wrote:  "I just wanted to touch base to see if the addition was something on your radar for next spring/summer? I know when we left off last year you indicated things were on hold and that 18' was more likely at that time… Builders are becoming more scarce as the market improves and Sullivan county sees an uptick due to the casino's *[sic]* and other development in the area etc."

81.     Mr. Weyer's comments to Mr. Sparago are consistent with Beaver Mountain's asserted expertise of local builders, and his comments imply that Beaver Mountain monitors builder and contractor circumstances and availability in Sullivan County – even though Beaver Mountain would later claim to be merely a supplier of materials.

82.     Then in a September 25, 2017 email to Mr. Sparago, Mr. Weyer wrote:  "I wanted to follow up on our meeting a couple weeks back.  Did you get a chance to review the timeline I put together?  Did you want to move forward with the next phase of drawings; this way we could have everything updated and ready to go for our meeting in November with the builder candidates?"

83.     Four days later on September 29, 2017, Mr. Weyer wrote to Mr. Sparago:  "We received your check – thank you.  I am guessing we will have updates completed by 3[rd] week of October +/-.  As we discussed, I will then PDF the floor plans and elevations over to you for review/comment.  We should be in good shape for builder intro's *[sic]* for early-mid November as planned.  I will be in touch…"

17

84.     On October 18, 2017, Mr. Weyer wrote to Mr. Sparago:  "I spoke to Max Dutcher today and he is open to meeting up with us in November as planned.  I told him when we nail down a date /time I would let him know.  I also spoke to a couple other contractors who expressed an interest as well."

85.     On November 3, 2017, Mr. Weyer wrote to Mr. Sparago in advance of their upcoming meeting with builders:  "I hope you are having a good week.  I have (3) builders lined up to meet with us next Friday.  The first contractor will be there around 10am and I have about 45min to an hour blocked off for each.  In between the meetings we can review the drawings we sent and answer any questions you may have.  10am – RJ Beechel – R & L Builders Shokan, NY.  11am – Max Dutcher – Walton, NY.  12pm – Tom Katz – TK Construction – Liberty, NY. Let me know if you have any questions."

86.     Then on November 11, 2017, Mr. Weyer wrote to Mr. Sparago:  "It was great seeing you and Connie yesterday . . . I thought we had a positive and productive afternoon.  I wanted to ask, are you comfortable and interested in all (3) builders?  Or do you prefer to zero in on one?  Let me know.  Joann will send out a summary shortly . . . John will be getting bid packet(s) out to the contractors early next week."

87.     Based on Beaver Mountain's coordination, involvement, recommendations, and guidance, customers do not have any way of knowing that Beaver Mountain later intends to have them agree that Beaver Mountain is only a supplier of materials and that the customers are solely responsible for the hiring of any builder.

**E.    Beaver Mountain Recommends Robert Beechel But
Omits The Unfavorable Information It Knew About Him**

88.    Throughout the end of 2017, Beaver Mountain was actively involved in introducing Mr. Sparago to Robert Beechel and in arranging for Robert Beechel to perform the construction work at the Premises.

89.    Beaver Mountain facilitated Mr. Sparago's hiring of Robert Beechel and R&L Builders to build the addition at the Premises.

90.    In late 2017 Beaver Mountain recommended Robert Beechel and his company (R&L Builders) as a reputable home improvement contractor for Mr. Sparago's addition to the Premises.

91.    On November 10, 2017, Chris Weyer, Beaver Mountain's Eastern New York and New England Regional Sales Manager, met with Mr. Sparago at the Premises and participated in meetings with the three contractors participating in the bidding process.  Mr. Weyer was specifically involved in the meeting and selection process and then specifically recommended Robert Beechel.

92.    Beaver Mountain (through Chris Weyer) positively recommended Robert Beechel and assured Mr. Sparago of his skill and capabilities – even though Mr. Weyer and Beaver Mountain knew at that point that other Beaver Mountain customers had complained about Robert Beechel's work.  Beaver Mountain failed to tell Mr. Sparago about the complaints about Robert Beechel even though Mr. Sparago specifically asked Mr. Weyer for that information.

93.    Chris Weyer (on Beaver Mountain's behalf) was personally involved in attempting to appease their other customers who had complained about Robert Beechel's work.

94.    At no time did Chris Weyer (or anyone else from Beaver Mountain) tell Mr. Sparago what he and Beaver Mountain knew about Robert Beechel even though

Mr. Sparago had specifically asked them for this information and even though Beaver Mountain knew that Mr. Sparago was relying on a misleading picture in selecting Robert Beechel to build the addition at the Premises.

95.     Mr. Sparago relied on Beaver Mountain's recommendation of Robert Beechel as a reputable builder, and Mr. Sparago depended on Beaver Mountain's advertised expertise in selecting reputable builders from its network.

96.     Beaver Mountain attempts to put its customers' minds at ease by assuring them it will find reputable builders for their construction projects.  This is precisely what Beaver Mountain told to Mr. Sparago when working with him to plan the addition to the Premises.

97.     Because of its stated expertise and its involvement in the process of finding local builders, Beaver Mountain was in a position of trust and confidence for Mr. Sparago – who relied on its recommendation of Robert Beechel as a reputable builder.

98.     In fact, Beaver Mountain urges its customers to rely on its stated expertise in selecting local builders, and here Mr. Sparago did just that.

99.     Even though Beaver Mountain knew that some of its other customers had complained about Robert Beechel, Beaver Mountain did not tell this to Mr. Sparago when he asked.

100.    More specifically, Beaver Mountain knew that Robert Beechel took three times longer to complete a job (over 12 months) that should have taken only four months.  And, Beaver Mountain knew that Robert Beechel's work for other customers was sub-par.  This information was material and would have led Mr. Sparago to turn to the other two builders who had bid on the project.

101.    Mr. Sparago specifically asked Beaver Mountain if it knew about any complaints that had been made about Robert Beechel or if it knew about any other problems with or concerns about Robert Beechel.  Beaver Mountain did not share with Mr. Sparago what it knew about Robert Beechel.

102.    As a result of Beaver Mountain's omission of material information that Mr. Sparago specifically asked for, Mr. Sparago relied on the false picture of Robert Beechel that Beaver Mountain created and hired Robert Beechel as his builder in February 2018.

103.    Once Mr. Sparago hired Robert Beechel and R&L Builders, they caused Mr. Sparago significant damage that Mr. Sparago is still trying to remediate.

104.    R&L and Robert Beechel failed to perform the work at the Premises in a good and workmanlike manner, failed to complete all of the work that was required under the contract, damaged other parts of the Premises that were not part of the scope of work, and failed to have adequate insurance coverage for their home improvement construction work.

105.    Among other things, Robert Beechel's and R&L's performance was sub-par because they:

- improperly graded the soil around the Premises;

- improperly installed footing drains for the extension it was building at the Premises;

- improperly installed dirty # 1 stone instead of the proper # 2 stone for draining, which led to pipes and drains becoming clogged with sediment and backfill;

- failed to tie the original foundation to the foundation of the extension (specifically, they did not use steel rebar to fasten the new wall to the old wall by drilling holes into old foundation, inserting rebar into these holes, and then connecting the rebar to new foundation);

- failed to seal the concrete foundation walls between the old and new portions of the Premises;

- improperly installed the concrete support columns for the decking in front of the extension and failed to place them below the 4-foot frost line;

- failed to install exterior insulation at the Premises;

- installed gutters backward;

- installed fiberglass insulation in the basement backward (specifically, the paper incorrectly faced down instead of facing up, which is the area that is being heated);

- installed the wrong flooring material with the wrong type of wood that is inappropriate for use with radiant floor heating; and

- improperly installed drywall in the bathroom and substantially bent three studs that required re-straightening.

106.   In addition, as project manager, Beaver Mountain shipped to the Premises over 50 tubes of caulking specifically formulated for log cabins for use in the construction work.  Beaver Mountain regards this caulking to be a necessary product in terms of preventing moisture damage from developing in the joints between the log siding.  Robert Beechel failed to use the majority of this caulking product, which has exposed the Premises to future mold and rot problems.  This flaw cannot be fixed.

107.   As project manager, Beaver Mountain shipped eight 6" x 6" x 12' timber ceiling beams for the new addition ceilings at the Premises.  Robert Beechel used two of the larger ceiling beams for inside corner blocks at the connection of the addition to the existing cabin rather than the correct smaller inside corner beams for the connection to the existing cabin.  This flaw cannot be fixed.

108.   And, Robert Beechel did not allow for "blocking" in the ceiling of the new addition which allows for the 6" x 6" x 12' timber ceiling beams to be safely fastened to the ceiling.  A new contractor had to alter the layout of the beams on the ceiling to accommodate for this flaw.

109.     R&L and Robert Beechel also caused Mr. Sparago to suffer property damage for items that were not part of the home improvement construction at the Premises.

110.     Specifically as to the damage they caused to Mr. Sparago's property, R&L and Robert Beechel (a) damaged the propane gas line at the Premises while digging to install a French drain, (b) damaged the original footing drains at the Premises (which were not part of the work) by causing them to become clogged with backfill, (c) buried and/or disconnected the perimeter piping at the Premises (and then tried to cover it up by placing a pipe in the ground that led nowhere (but made it seem as though the pipe had been fixed), and (d) caused the original deck at the Premises to have to be removed to allow replacement footing drains to be installed in place of the drains that Robert Beechel and R&L Builders damaged.

111.     Because R&L failed to perform its contracting services adequately, Mr. Sparago was required to hire another contractor and additional professionals to complete and/or to remediate R&L's sub-par work.

112.     Mr. Sparago has incurred significant costs in remediating Robert Beechel's and R&L Builders' work and in fixing the additional property damage that they caused at the Premises.  Mr. Sparago paid approximately $170,000 to Robert Beechel and R&L Builders for work that had to be redone because it was unsatisfactory.

113.     Mr. Sparago has also spent an additional $115,000 for other professionals and contractors to fix Robert Beechel's sub-par work.  Mr. Sparago also will incur at least an additional $15,000 for work that has not yet been done but which is needed to fix the remaining items and issues stemming from Robert Beechel's defective construction.

114.     In addition, Mr. Sparago has discovered that R&L Builders and Robert Beechel misrepresented that they had sufficient insurance coverage for their work at the Premises.

115.    R&L Builders and Robert Beechel do not have insurance for defective construction work, even though they provided Mr. Sparago with a Certificate of Liability Insurance and made it seem as though they were sufficiently insured.

116.    Mr. Sparago has had to undo and/or remediate the work that R&L and Robert Beechel did at the Premises because it is substandard and unsatisfactory.  It falls well below industry standards for home improvement contractors.

117.    If Mr. Sparago did not remediate R&L's and Robert Beechel's defective construction work, the damages and impact of that poor work would get worse over time. Mr. Sparago took all necessary steps to mitigate and to remediate R&L's and Robert Beechel's defective construction and the separate property damage that they caused at the Premises.

118.    All of Mr. Sparago's damages and the awful experience he has suffered from Robert Beechel's defective construction could have been avoided had Beaver Mountain told Mr. Sparago about the prior complaints other customers had made about Robert Beechel.

119.    Despite having an obligation to provide all material information – especially when Mr. Sparago asked for that information – Beaver Mountain failed to disclose all of the material information it had about Robert Beechel.

120.    Beaver Mountain did not simply give Mr. Sparago a few names of contractors he could call and then wish him well.  Instead, Beaver Mountain was actively involved in the entire process, initially recommended several contractors, helped Mr. Sparago to interview the contractors, gave Mr. Sparago a positive review about Robert Beechel, reassured Mr. Sparago about Robert Beechel's skill and capabilities, intentionally omitted negative information about Robert Beechel that Mr. Sparago specifically had asked for, and then tried to fix the situation

afterward with its continued involvement when Mr. Sparago learned that Robert Beechel's work was sub-par.

121.   And, Beaver Mountain asks for its customers' reliance on its expertise in selecting local builders.  As it explains in Step Four, "Some of our customers come to us with a Builder already in mind.  <u>Others prefer we offer suggestions based on our decades of experience with Builders in your area.  Rely on us to schedule introductions, meet with you and potential Builders</u>" (https://beavermtn.com/get-started/) (emphasis added).

122.   Mr. Sparago noted his reliance on Beaver Mountain's expertise in a March 11, 2019 email to Chris Weyer – sent after the problems with Robert Beechel had already started to occur – in which Mr. Sparago explained:  "I'm going to ask that you do all that you and Beaver Mountain can to help us out in mediating some sort of solution.  We ultimately trusted your judgment in recommending this individual to us."

123.   Beaver Mountain is responsible for the damages caused by its negligent omissions that led directly to Mr. Sparago's hiring of Robert Beechel and R&L Builders.

124.   And, Beaver Mountain is responsible for its deceptive consumer-oriented conduct as described above.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Violation of New York General Business Law Section 349)**

125.   Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein.

126.   General Business Law Section 349(a) prohibits any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.  A private action under Section 349(h) such as this requires (i) that the challenged act or

practice was consumer-oriented, (ii) that it was misleading in a material way, and (iii) that the plaintiff suffered injury as a result of the deceptive act.

127.    As described in detail above, Beaver Mountain assures its customers on its website, in its printed promotional materials, and on other documents that it will be there for them "every step of the way."  Beaver Mountain promises its customers that they can involve themselves in as much or as little of the process as they choose – shifting any unwanted involvement to Beaver Mountain and its decades of expertise.  And, Beaver Mountain tells its customers that it provides continuing support for any builders who require it during the construction process.

128.    Beaver Mountain also tells its customers that it will coordinate the builder selection process and that they can rely on Beaver Mountain's knowledge and expertise of local builders.

129.    Beaver Mountain then interacts with the proposed builders, coordinates bid packages, and then analyzes those bids for its customers – literally spearheading the entire process of selecting a builder.

130.    But, after all of that takes place, Beaver Mountain quietly has its customers sign a Purchase Agreement containing boilerplate terms in Paragraph 10 on the reverse side that attempt to make Beaver Mountain nothing more than a supplier of the materials to be used for the construction.  Beaver Mountain's Purchase Agreement also disclaims Beaver Mountain's responsibility for both the builder's work and for the selection of the builder – even though Beaver Mountain has just completed spearheading that process for its customers and has urged its customers to rely on its expertise in recommending local builders.

131.     Beaver Mountain then uses the provisions in Paragraph 10 of the Purchase Agreement to evade any responsibility for the actions on which it assured its customers could rely.

132.     Beaver Mountain's conduct as described herein (and specifically the proverbial "bait and switch" made by using the terms contained in Paragraph 10 of the Purchase Agreement) constitutes a deceptive consumer-oriented practice in violation of General Business Law Section 349(a).

133.     Because Beaver Mountain's promises are disseminated broadly to all customers and potential customers in its electronic and promotional materials (and then reiterated by its employees in person), Beaver Mountain's conduct as alleged herein is consumer-oriented.

134.     In addition, Beaver Mountain's quiet inclusion of the terms in Paragraph 10 of its pre-printed Purchase Agreement (used with all of its customers) is deceptive and misleading because customers think that Beaver Mountain is actually with them "every step of the way" as advertised.

135.     In addition, Beaver Mountain does not have its customers sign the Purchase Agreement until _after_ they have planned and designed the log cabin, _after_ they have made several payment deposits, _after_ they have met with potential builders in a process led by Beaver Mountain, and _after_ they have selected a builder.  (_See_ Exh. 2)

136.     After a customer has spent time, money, and effort working on the planning and design, and after a customer has met with builders that Beaver Mountain proposed and coordinated (all while thinking both that Beaver Mountain will be there "every step of the way" and that the customer can be involved in the process "as much or as little as you want, knowing we always have your back"), Beaver Mountain then has that customer sign the Purchase

Agreement stating that Beaver Mountain is not responsible for anything except for providing the materials used to build the project.

137.     Specifically here, Mr. Sparago and Beaver Mountain did not sign the Purchase Agreement until the second half of December 2017 – after Beaver Mountain had already provided its printed, bound analysis of the bids made by the three builders Beaver Mountain recommended.

138.     Both with Mr. Sparago and with its customers more broadly, Beaver Mountain's conduct as alleged herein is both consumer-oriented and deceptive in violation of General Business Law Section 349.

139.     Mr. Sparago has suffered damages directly because of Beaver Mountain's deceptive conduct.  Specifically, Beaver Mountain has raised the provisions of Paragraph 10 as a defense to any responsibility for recommending Robert Beechel, even though it spearheaded the selection process and recommended Robert Beechel to Mr. Sparago before Beaver Mountain and Mr. Sparago signed the Purchase Agreement.

140.     In addition, Beaver Mountain withheld from Mr. Sparago during the selection process material negative information it knew about Robert Beechel – even though Mr. Sparago specifically asked Beaver Mountain for this information.  By now hiding behind Paragraph 10 of the Purchase Agreement to deflect responsibility for the selection of Robert Beechel, the damages from Beaver Mountain's deceptive "bait and switch" conduct has materialized.

141.     Mr. Sparago (and other customers like him) have been harmed by Beaver Mountain's deceptive conduct because they are now purportedly bound by terms in the Purchase Agreement that are wholly inconsistent with the advertised lure that Beaver Mountain would be there with them "every step of the way."

142.     As a direct and proximate result of Beaver Mountain's deceptive consumer-oriented conduct as alleged herein, Mr. Sparago has suffered direct, compensatory, and consequential damages in an amount to be proved at trial but greater than $75,000.  In addition, Mr. Sparago is entitled to reasonable attorneys' fees pursuant to New York General Business Law Section 349(h).

## AS AND FOR A SECOND CAUSE OF ACTION
### (Negligence)

143.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein.

144.     Beaver Mountain immerses itself in the process through which its customers find and select builders, telling its customers like Mr. Sparago that it has a network of reliable builders to match with customers and provides itself as a resource to customers' builders during the construction process.

145.     Beaver Mountain attempts to put its customers' minds at ease by assuring them it will find reputable builders for their construction projects.  This is precisely what Beaver Mountain told to Mr. Sparago when working with him to plan the addition to the Premises.

146.     Because Beaver Mountain assumed the role of project manager and immersed itself into the process of recommending and selecting a contractor, Beaver Mountain assumed a duty to Mr. Sparago to perform properly in that role.

147.     Beaver Mountain told Mr. Sparago about its stated expertise and its involvement in the process of finding local builders, which is why Mr. Sparago relied on Beaver Mountain when it recommended Robert Beechel as a reputable builder for the addition at the Premises.

148.     Beaver Mountain breached its duty of care to Mr. Sparago by omitting critical information about other customer complaints against Robert Beechel and his sub-par

construction work – information that it was aware of because of recent problems it had to address with other customers who had complained about Robert Beechel.

149.     Beaver Mountain breached its duty of care to Mr. Sparago by making a positive recommendation about Robert Beechel even though it knew Robert Beechel was not a reputable contractor.

150.     Beaver Mountain breached its duty of care to Mr. Sparago by recommending Robert Beechel to Mr. Sparago for the construction work at the Premises even though it had reason to know that Robert Beechel should not have been recommended.

151.     Beaver Mountain's breaches of its duty of care to Mr. Sparago caused Mr. Sparago to suffer substantial damages, including the harms resulting from Robert Beechel's defective construction and Robert Beechel's misrepresentations about having been properly insured.

152.     The damages that Mr. Sparago suffered directly as a result of Beaver Mountain's negligent recommendation of Robert Beechel were completely foreseeable (and avoidable).

153.     As a direct and proximate result of Beaver Mountain's conduct as alleged herein, Mr. Sparago has suffered direct, compensatory, and consequential damages in an amount to be proved at trial but greater than $75,000.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Negligent Misrepresentation)**

154.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein.

155.     As detailed above, Mr. Sparago and Beaver Mountain had a relationship of trust or confidence that imposed a duty on Beaver Mountain to impart correct and complete information to Mr. Sparago.

156. Beaver Mountain managed the entire planning and building process – including the recommendation and selection of a contractor – and was in a far superior position of knowledge, trust, and expertise about the various contractors in the Beaver Mountain network. In fact, that is part of Beaver Mountain's selling points – that it is the expert you can trust to manage the process every step of the way (including the contractors who build the Beaver Mountain homes and additions).

157. As Beaver Mountain tells its customers, "We make it easier, our expertise works for you, every step of the way!"

158. Beaver Mountain even urges its customers to rely on its expertise in recommending and selecting local builders, explaining in Step Four: "Some of our customers come to us with a Builder already in mind. Others prefer we offer suggestions based on our decades of experience with Builders in your area. Rely on us to schedule introductions, meet with you and potential Builders" (https://beavermtn.com/get-started/) (emphasis added).

159. Because of Beaver Mountain's touted expertise and its involvement in the process of finding builders for Mr. Sparago, Beaver Mountain was in a position of trust and confidence for Mr. Sparago – who relied on Beaver Mountain's positive recommendation of Robert Beechel as a reputable builder that it first made to Mr. Sparago in late 2017 (and then repeated throughout the end of 2017 and early 2018).

160. On November 10, 2017, Chris Weyer (on behalf of Beaver Mountain) met with Mr. Sparago at the Premises and participated in meetings with the three contractors participating in the bidding process. Mr. Weyer was specifically involved in the meeting and selection process and then specifically recommended that Mr. Sparago select Robert Beechel because he was a good contractor.

161.    Even though Beaver Mountain knew that some of its other customers had complained to it about Robert Beechel and his unacceptable performance, Beaver Mountain did not tell this to Mr. Sparago.

162.    Because other customers had already complained to Beaver Mountain, Beaver Mountain knew that Robert Beechel took three times longer to complete a job (over 12 months) that should have taken only four months.  And, Beaver Mountain knew that Robert Beechel's work for other customers was sub-par and defective.

163.    Mr. Sparago specifically asked Chris Weyer (who was acting on Beaver Mountain's behalf) if he knew about any complaints that had been made about Robert Beechel or if there had been any other problems with or concerns about Robert Beechel as a contractor. Beaver Mountain (through Chris Weyer) did not share with Mr. Sparago what it knew about Robert Beechel.

164.    Throughout the end of 2017 and early 2018, Beaver Mountain gave Mr. Sparago an incomplete and false recommendation of Robert Beechel that was incorrect, even though Beaver Mountain knew that Mr. Sparago was and would be relying on Beaver Mountain's expertise in the selection of a contractor.

165.    Chris Weyer (acting on behalf of Beaver Mountain) positively recommended Robert Beechel and assured Mr. Sparago of his skill and capabilities – even though Beaver Mountain knew at that point that other Beaver Mountain customers had complained about Robert Beechel's work.  Chris Weyer (on Beaver Mountain's behalf) had been personally involved in attempting to appease their other customers who had complained about Robert Beechel's work before Mr. Sparago even considered Robert Beechel as a builder.

166.    In response to direct questions Mr. Sparago had asked him, Chris Weyer (on behalf of Beaver Mountain) gave Mr. Sparago positive assurances about Robert Beechel that he was a reputable and skilled contractor.  Despite having a duty to disclose all material information to Mr. Sparago, Chris Weyer (on behalf of Beaver Mountain) omitted the negative information he knew about Robert Beechel and provided to Mr. Sparago a misleading and incorrect picture about Robert Beechel.

167.    Even though Mr. Sparago specifically asked Chris Weyer if he knew anything about Robert Beechel that was concerning, Chris Weyer (on behalf of Beaver Mountain) shared nothing with Mr. Sparago other than positive assurances that he was a good contractor.

168.    As a result of Beaver Mountain's omission of material information that Mr. Sparago specifically asked for, Mr. Sparago relied on the false picture of Robert Beechel that Beaver Mountain communicated and hired Robert Beechel as his builder in February 2018.

169.    Mr. Sparago's reliance on the information about Robert Beechel that Beaver Mountain gave him (including the omission of material information) was reasonable because of the intentional position of trust and confidence that Beaver Mountain assumed vis-à-vis Mr. Sparago as the project manager (and through its advertisement of its expertise in selecting local builders).

170.    Mr. Sparago has suffered substantial damages directly from his reliance on Beaver Mountain's misinformation and omissions.

171.    As a direct and proximate result of Beaver Mountain's conduct as alleged herein, Mr. Sparago has suffered damages in an amount to be proved at trial but greater than $75,000.

## JURY DEMAND

172.    Plaintiff demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays for a judgment granting:

    i.    On his First Cause of Action, compensatory and consequential damages in an amount to be proved at trial but greater than $75,000 and reasonable attorneys' fees pursuant to New York General Business Law Section 349(h);

    ii.    On his Second Cause of Action, compensatory and consequential damages in an amount to be proved at trial but greater than $75,000;

    iii.    On his Third Cause of Action, compensatory and consequential damages in an amount to be proved at trial but greater than $75,000;

    iv.    The costs and the expenses related to this action; and

    v.    Such other and further relief as the Court deems just and proper.

Dated:   White Plains, New York
          April 3, 2020

                        Respectfully Submitted,

                        BRICK LAW PLLC

                        By: ____/s/  Brian H. Brick_____
                              Brian H. Brick, Esq.

                        2 Milford Close
                        White Plains, New York  10606
                        (917) 696-3430
                        brianbrick@bricklawpllc.com

                        *Attorneys for Plaintiff*

EXHIBIT  1



**BEAVER MOUNTAIN**
Log & Cedar Homes

*Timeless Beauty. Naturally Home.*

www.BeaverMtn.com

1740 County Highway 48
Deposit, NY 13754

Phone: 607-467-2700
Toll-Free: 800-233-2770
Fax: 607-467-2710

## PURCHASE AGREEMENT

PURCHASER: Gary or Connie Sparago        Date: December 11, 2017

Address: 31 Leary Lane        Design No.: 17-148-18TF

Edgewater, NJ 07020

Building Site: Neversink, NY        Phone: 646-857-8176

County: Sullivan

HOME STYLE: 22'x24' Ranch Addition with 14'x12' Connector

- Approx. Main Level Area: 696 Sq. Ft.  • Approx. Upper Level Area: _____
- Approx. Lower Level Area: _____

- Custom Home Materials & Services to be provided as listed on the attached
  Material Specifications & Customer Services ………………………………… . SALE PRICE: $ 86,210.00
- 3"x6" Pine Siding at 2"x6" pine siding pricing …………………………………(DEDUCT): $ 3,760.00
- Special 5% Early Order Discount Valid with below payment schedule ………...(DEDUCT): $ 4,122.50

SUBTOTAL: $ 78,327.50

8 % Sales Tax (ADD): $ 6,266.20

TOTAL AMOUNT DUE: $ 84,593.70

### PAYABLE AS FOLLOWS:

- Planning Payment……….................Paid by Check # 1019        Date: 11/06/15    $ 3,500.00
- Drawing Payment ………………..Paid by Check # 1001        Date: 9/26/17    $ 6,500.00
- Order Payment ………………..........Paid by Check # 1002        Date: 12/8/17    $ 16,000.00
- Pre-Manufacturing Payment................................Due on or before -    Date: 4/01/18    $ 30,000.00
- Balance due by CERTIFIED CHECK upon or before delivery-    Date: 9/06/18    $ 28,593.70

--------------------------------------------------------------------------------

- DELIVERY – Split with storage up to 30 days ☐ No ☐ Yes  1ST Delivery: _____    2ND Delivery: _____

This Purchase Agreement is not final and binding until it is accepted by Beaver Mountain Log & Cedar Homes and
signed by an authorized officer and is subject to the Terms and Conditions stated on reverse side.

_Gary Sparago_                12/16/17        _[signature]_                14/24/17

Purchaser/Co-Purchaser Acceptance        Date        Beaver Mountain        Date

09/17

**PURCHASE AGREEMENT TERMS AND CONDITIONS**

1. This Purchase Agreement is not final and binding until it is accepted by and signed on behalf of Beaver Mountain by authorized personnel. The Purchase Agreement by Beaver Mountain Log Homes, Inc. d/b/a Beaver Mountain Log & Cedar Homes (Seller) and the resulting acceptance by the Purchaser (customers signature required on the front hereof) is subject to the following terms and conditions.

2. These Purchase Agreement Material Specifications and Prices are based on your signed Design Drawings, Quotation, and/or other information prepared by the seller's engineering department and are subject to revision if design changes are requested by the Purchaser in writing. This Purchase Agreement cannot be changed, altered or amended without the written consent and agreement of both parties. Labor and materials not so specified in the Purchase Agreement will be billed accordingly and could affect your delivery schedule.

3. Where discrepancies arise between Construction, Assembly and Detail Drawings and Purchase Agreement specifications, the Purchase Agreement shall govern. Materials not specified are to be supplied by Purchaser.

4. Dimensions provided for materials refer to commonly accepted industry standards, which vary from actual dimensions. eg. 2"x4" actual dimension is approximately 1 ½" x 3 ½".

5. The Seller guarantees the Purchase Agreement price of all materials purchased herein for six (6) months from the Purchase Agreement date, provided it is signed and returned within twenty-one (21) days and payments are made in accordance with the Purchase Agreement payment schedule. The Purchaser agrees to accept delivery of all materials in this Purchase Agreement within six (6) months from the date of this Purchase Agreement and the Purchaser further agrees to pay the price in effect thereafter.

6. In the event that the Purchaser elects NOT to proceed with order <u>less than 12 weeks</u> prior to the scheduled delivery date, a refund, if any, will be directly proportional to the status of the drawings, production and/or ordering of materials specified with a minimum of 25% of total material sales price retained for liquidation charges. In the event that the Purchaser elects NOT to proceed with order underline{at least 12 weeks} prior to the scheduled delivery date and prior to ordering of materials or the start of manufacturing, Beaver Mountain shall retain a minimum of 10% of total material sale price for Design, Drawing, Engineering and Administration charges.

7. If it becomes necessary for the Purchaser to reschedule delivery, the Seller must be advised at least 48 hours before the established delivery date. Any delivery that is delayed more than fourteen <u>(14) days</u> beyond the scheduled delivery date for the Purchaser's convenience, is subject to additional charges if $250.00 per week for storage and handling.

8. The Purchaser agrees to pay in full, by certified check(s) all balances, taxes, and delivery charges on materials upon delivery before unloading the trucks. When split deliveries are selected, <u>all materials</u> must be delivered within sixty (60) days from the 1st scheduled delivery.

9. The Seller shall not be responsible for delays in the manufacture or delivery of materials ordered if delay is caused by Acts of God, labor troubles, shortages of materials, or other causes beyond the Seller's control. The Seller reserves the right to discontinue and/or make changes in any of its products and substitute products of similar quality and price as may be necessary, with prior notice to Purchaser.

10. THE PURCHASER ACKNOWLEDGES THAT THE SELLER IS A SUPPLIER OF MATERIALS ONLY. All responsibility of materials from the Seller ends on delivery in good condition of materials listed in this Purchase Agreement. Discrepancies should be reported immediately and any purchases or back charges must have prior written authorization from the Seller. The Seller assumes no responsibility for erection or proper installation of materials, securing of permits or compliance with any government codes, regulations or zoning. The Purchaser also acknowledges that they are solely responsible for the selection of the contractor(s). The Seller is not responsible for the quality of the contractor(s) work and the contractor(s) are not an agent(s) or employee(s) of the Seller but is an independent contractor(s). The Purchaser also assumes responsibility for securing appropriate insurance(s) and verification of insurance(s) from contractor(s).

11. It is the Purchaser's responsibility to provide a solid road leading from the main road to the building site. There has to be provided a level area large enough to unload materials. If, for any reason, the truck driver determines that the road leading to the building site is impassable, or that there is a bridge that will not support the load, it will be the Purchaser's responsibility to get the materials to the building site from that point. The seller is not responsible for damage to persons or property occurred by delivery of materials to site or unloading of materials.

12. It is important that the Purchaser or their Contractor be on hand to sign for the materials being delivered. At the time of delivery, the Purchaser or the Contractor will inspect all materials for damages and quantity discrepancies and report it in writing to the driver. Manpower and equipment for unloading of materials must be provided by the purchaser. The driver of the truck or his/her assistant will not be caused to become involved in the unloading of materials or the erection of the structure. Unloading for each truck must be completed in two (2) hour period from the scheduled arrival time. Additional fees will be charged after two (2) hours, payable to the driver at the time of delivery.

13. We wish to bring to your attention that checking, warping, twisting and/or shrinkage are natural characteristics of wood (not defects) and that wood does require a certain amount of maintenance; cleaning, caulking, surface treatments, etc. (Note: Exterior treatments should be applied per its manufacturers specifications, depending on weather and exposure). Also, a humidifier may be required to maintain a normal humidity level in your home.

14. EXCEPT AS EXPRESSLY PROVIDED FOR IN THE BEAVER MOUNTAIN PROMISE AND LIMITED WARRANTY, SELLER DISCLAIMS ALL WARRANTIES, WHETHER STATUTORY, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF FITNESS FOR USE AND MERCHANTABILITY, EXCEPT AS TO TITLE. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR LOSS REVENUES. LOST PROFITS OR OTHER INDIRECT, CONSEQUENTIAL, SPECIAL OR PUNITIVE LOSSES OR DAMAGES, HOWEVER CAUSED WHETHER AN ACTION FOR BREACH OF CONTRACT, STRICT LIABILITY, TORT OR OTHERWISE, EVEN IF ADVISED WITH THE POSSIBILITY OF SUCH LOSS OR DAMAGES. IN NO EVENT WILL THE SELLER'S LIABILITY BE GREATER THAN THE TOTAL VALUE OF THE PRODUCTS GIVING RISE TO SUCH CLAIM.

15. The Purchaser represents and warrants that any plans and/or sketches that they have provided are not the result of unauthorized use of copyrighted works and further agrees to indemnify and hold Beaver Mountain Log & Cedar Homes harmless from liability incurred.

16. This agreement shall be governed by and subject to and construed according to the laws of the State of New York, notwithstanding the ultimate destination of the materials sold by the seller.

EXHIBIT  2



**BEAVER MOUNTAIN**
Log & Cedar Homes

*Timeless Beauty. Naturally Home.*

www.BeaverMtn.com

1740 County Highway 48
Deposit, NY 13754

Phone: 607-467-2700
Toll-Free: 800-233-2770
Fax: 607-467-2710

# Project Time Line

- Design Consultation - Design Process Begins:      11/06/15

- Approve Home Design, Budget, Schedule & payment:      9/30/17  ($6500.00)

- Builder Selections and Select Financing:      Between 11/1/17-11/15/17

- Finalize Home Plans, Total Investment & Building Schedule :      Between 12/1/17-12/15/17

- Order Home, Purchase Agreement, next payment:      12/15/17

- Custom Home Production  process begins and next payment:      6/14/18

- Beaver Mountain Delivery and Final Payment - Construction Begins:      9/6/18

- Delivery of Interior Materials - Construction Continues :      As Needed

- Proposed Move In, Relax and Enjoy Your New Home: