UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x
                                            :
GARY SPARAGO,                               :
                                            :
                          Plaintiff,        :        Case No. 20 Civ. 276 (KMK)
                                            :
            - against –                     :
                                            :
                                            :
BEAVER MOUNTAIN LOG HOMES, INC.,            :
                                            :
                          Defendant.        :
                                            :
                                            :
------------------------------------------- x

 

 

**MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

 

 

 

BRICK LAW PLLC
2 Milford Close
White Plains, New York  10606
(917) 696-3430

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ......................................................... 1

ARGUMENT ........................................................................................ 3

I.     MR. SPARAGO'S GENERAL BUSINESS LAW SECTION 349 CLAIM
IS LEGALLY SUFFICIENT AND SHOULD NOT BE DISMISSED............................ 4

     A.    The Amended Complaint Provides Facts Describing Beaver Mountain's
Deceptive *Practice* (Not A Deceptive Contract) .................................... 6

     B.    Beaver Mountain Ignores The Dozens Of Documents It Gave To
Mr. Sparago And Misses The Point Of The Amended Complaint's
References To Beaver Mountain's Website ......................................... 11

     C.    Mr. Sparago Has Sufficiently Alleged Damages Caused By Beaver
Mountain's Deceptive Practice ........................................................... 16

II.    MR. SPARAGO'S NEGLIGENT MISREPRESENTATION CLAIM IS
LEGALLY SUFFICIENT AND SHOULD NOT BE DISMISSED ................................ 18

     A.    Beaver Mountain Owed Mr. Sparago A Duty Of Complete And Accurate
Disclosure For Two Independent Reasons ........................................... 18

     B.    The Purchase Agreement Disclaimers Do Not Impact Mr. Sparago's
Reliance Before He Signed The Purchase Agreement .......................... 21

     C.    The Amended Complaint Satisfies Rule 9(b)'s Heightened Pleading
Standards .......................................................................................... 22

III.   MR. SPARAGO'S NEGLIGENCE CLAIM IS LEGALLY SUFFICIENT .................... 23

CONCLUSION .................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  910 F. Supp. 2d 543 (S.D.N.Y. 2012)......................................................................18

*Amalfitano v. NBTY, Inc.*,
  128 A.D.3d 743 (2d Dep't 2015) ............................................................................17

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
  528 F. Supp. 2d 206 (S.D.N.Y.2007)..................................................................19, 20

*DeAngelis v. Timberpeg E., Inc.*,
  51 A.D.3d 1175 (3d Dep't 2008) .........................................................................6-7, 8

*Electrolux Corp. v. Val-Worth, Inc.*,
  6 N.Y.2d 556 (1959) ..............................................................................................5

*Gaidon v. Guardian Life Ins. Co. of Amer.*,
  94 N.Y.2d 330 (1999) .............................................................................................6

*Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.*,
  129 Misc. 2d 123 (Sup. Ct. N.Y. Co. 1985) ...............................................................5

*Hampshire Recreation, LLC v. Village of Mamaroneck*,
  2016 WL 1181727 (S.D.N.Y. Mar. 25, 2016) .........................................................3-4

*Kacocha v. Nestle Purina Petcare Co.*,
  2016 WL 4367991 (S.D.N.Y. Aug. 12, 2016)............................................................6

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (1996) ...........................................................................................20

*Koch v. Greenberg*,
  2008 WL 4450273 (S.D.N.Y. Sept. 30, 2008)...........................................................7

*Lebovitz v. Dow Jones and Co.*,
  508 Fed. App'x 83 (2d Cir. 2013).............................................................................9

*Lugones v. Pete and Gerry's Organic, LLC*,
  2020 WL 871521 (S.D.N.Y. Feb. 21, 2020)..............................................................6

*Michelo v. National Collegiate Student Loan Trust 2007-2*,
  419 F. Supp. 3d 668 (S.D.N.Y. 2019).....................................................................17

*Morrissey v. Nextel Partners, Inc.*,
   72 A.D.3d 209 (3d Dep't 2010) .................................................................6, 11

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
   85 F. Supp. 2d 282 (S.D.N.Y. 2000) ......................................................22, 23

*O'Neill v. Standard Homeopathic Co.*,
   346 F. Supp. 3d 511 (S.D.N.Y. 2018) ....................................................... 4-5

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) .....................................................................................5

*Parrott v. Coopers & Lybrand, LLP*,
   95 N.Y.2d 479 (2000) ..................................................................................19

*Pelman ex rel. Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005) ..........................................................................4

*People ex rel. Schneiderman v. One Source Networking, Inc.*,
   125 A.D.3d 1354 (4th Dep't 2015) .............................................................8, 9

*Rankel v. Town of Somers*,
   999 F. Supp. 2d 527 (S.D.N.Y. 2014) ............................................................3

*Solutia Inc. v. FMC Corp.*,
   456 F. Supp. 2d 429 (S.D.N.Y. 2006) ..........................................................22

*Sykes v. RFD Third Ave. 1 Assocs., LLC*,
   67 A.D.3d 162 (1st Dep't 2009),
   *aff'd*, 15 N.Y.3d 370 (2010) ................................................................. 19-20

**Statutes and Rules**

Fed. R. Civ. P. 8 ..................................................................................................3

Fed. R. Civ. P. 9(b) ................................................................................4, 22, 23

Fed. R. Civ. P. 12(b)(6) ...................................................................................1, 24

N.Y. Gen. Bus. L. § 349(a) .....................................................................*passim*

N.Y. U.C.C. § 2-715(2) ......................................................................................18

Plaintiff Gary Sparago, by his attorneys Brick Law PLLC, respectfully submits this memorandum of law in opposition to Defendant's motion for an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing the Amended Complaint.

## PRELIMINARY STATEMENT

The Amended Complaint illustrates Beaver Mountain's relatively simple but nonetheless deceptive consumer practice – by which it first assures its customers that Beaver Mountain will manage and facilitate their log cabin home projects but later changes its status to nothing other than a "supplier of materials only" through a Purchase Agreement that customers do not see or sign until after they have already committed money, time, and effort to Beaver Mountain for their log cabin projects. The Court readily discerned the deceptive practice alleged in the Amended Complaint during the parties' May 11, 2020 pre-motion conference and indicated that the Amended Complaint appeared to satisfy the pleading standards for Mr. Sparago's claims. But, Beaver Mountain seeks a dismissal of the Amended Complaint anyway – although none of its arguments fares any better than those raised in its pre-motion letter.

Beaver Mountain's business practice is deceptive and violates General Business Law Section 349 because a customer does not receive the Purchase Agreement (with the disclaimer and limiting language that Beaver Mountain will use to evade liability) until after Beaver Mountain has told the customer it will manage the entire process, after the customer has worked on designs and plans with Beaver Mountain, after the customer has made several payments to Beaver Mountain, and after Beaver Mountain has actually managed the builder selection process for the customer for which it then disclaims liability in the Purchase Agreement.

Beaver Mountain weaves a story that it fully discloses to its customers the terms of the Purchase Agreement before they sign that agreement. But, this story fails to consider the most

important consideration driving why specifically the business practice is deceptive to Beaver

Mountain's customers:  it is the timing of <u>when</u> specifically a customer first sees the Purchase

Agreement with its disclaimer and limiting provisions.  Because customers like Mr. Sparago are

not given the Purchase Agreement until (i) after they have already designed their log cabins,

(ii) after they have made sizeable cash deposits toward their log cabin projects, (iii) after they

have met with potential builders in a bid process coordinated by Beaver Mountain, and (iv) in

many cases after they have selected and hired the builder for their projects.  This is hardly full

disclosure of all material information before a customer first engages with Beaver Mountain.

Customers are not shown the disclaimers and limiting language describing Beaver Mountain as

merely a supplier of materials until after all of these milestones in their building projects.

   In addition to Beaver Mountain's deceptive consumer practice, Beaver Mountain also

withheld material information from Mr. Sparago about one of the builders Beaver Mountain

included in the bid process – the builder he ultimately hired (Robert Beechel).  During the

builder introduction and bidding process, Mr. Sparago met with Chris Weyer, one of Beaver

Mountain's Regional Sales Managers, to discuss the builders being considered for Mr. Sparago's

log cabin project.  During that meeting, Mr. Sparago specifically asked Mr. Weyer if he knew

about any complaints from prior Beaver Mountain customers about Robert Beechel or his work.

   In fact, Mr. Weyer <u>did</u> know about prior Beaver Mountain customers who had <u>recently</u>

complained about Robert Beechel's workmanship.  Mr. Weyer knew about these prior

complaints because he was specifically involved in addressing and resolving them.  But, despite

Mr. Sparago's direct and specific questions for this information, Mr. Weyer failed to reveal it

and instead told Mr. Sparago that Robert Beechel was a good builder with no known issues.  In

direct reliance on Beaver Mountain's inaccurate and incomplete positive recommendation,

Mr. Sparago hired Robert Beechel – who make significant, serious, and costly errors that

Mr. Sparago is still working to resolve.  Had Mr. Weyer been truthful and accurate in responding

to Mr. Sparago's questions about Robert Beechel, Mr. Sparago would have stopped considering

Mr. Beechel and would have instead turned to the other two builders who had submitted bids for

the project.

Beaver Mountain should be held accountable for deceiving its customers, which it

appears to have been doing since at least 2015 and which it continues today.  Beaver Mountain's

current website contains ample information misleading its customers into thinking that Beaver

Mountain is the project manager who will take care of their project "every step of the way."

Instead, Beaver Mountain changes its status to a supplier of materials only through a deceptive

evasion of liability completed when Beaver Mountain later passes its customers a Purchase

Agreement to sign.  And Beaver Mountain should be responsible for giving Mr. Sparago an

incomplete and misleading review during the bidding process that Beaver Mountain led for

Mr. Sparago as the project manager.

None of Beaver Mountain's arguments warrants a dismissal of the claims in the

Amended Complaint.  Beaver Mountain's motion to dismiss should be denied.

## **ARGUMENT**

The Amended Complaint should survive Beaver Mountain's motion to dismiss because it

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 536 (S.D.N.Y. 2014) (citations

omitted).  Plaintiff's claims have facial plausibility because the Amended Complaint's

substantial factual detail goes well beyond the minimums imposed by Rule 8 and "allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Hampshire Recreation, LLC v. Village of Mamaroneck*, 2016 WL 1181727, at \*4 (S.D.N.Y. Mar. 25, 2016) (citation omitted).

Despite the Amended Complaint's 172 paragraphs mostly containing factual detail, Beaver Mountain argues that Rule 9(b)'s heightened pleading standards thwart Mr. Sparago's claims here.  But, claims brought under General Business Law § 349 are not subject to the particularity requirements of Rule 9(b).  *See Pelman ex rel. Pelman v. McDonald's Corp*., 396 F.3d 508, 511 (2d Cir. 2005).  And, Beaver Mountain's overall suggestion that the Amended Complaint lacks sufficient factual detail is incongruous with reality – even the Court noted during the May 11, 2020 pre-motion conference that the Amended Complaint appears to go past the minimum pleading standards.

## I.

### MR. SPARAGO'S GENERAL BUSINESS LAW SECTION 349 CLAIM IS LEGALLY SUFFICIENT AND SHOULD NOT BE DISMISSED

During the pre-motion conference, the Court recognized that the Amended Complaint appears to present a facially-plausible claim:  that Beaver Mountain deceived its customers by assuring them that Beaver Mountain will manage their log cabin projects (start-to-finish) only to switch those assurances well into each project with the limiting terms on the reverse side of the Purchase Agreement.  Although the Court cautioned Beaver Mountain that its motion would require more compelling arguments for a dismissal than what it had offered, Beaver Mountain still falls short in its attack on Mr. Sparago's General Business Law Section 349(a) claim.

As this Court has previously explained, "[a] plaintiff under [§] 349 must prove three elements:  first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *O'Neill v. Standard Homeopathic Co*., 346 F. Supp. 3d 511, 529 (S.D.N.Y.

2018) (Karas, U.S.D.J.) (denying motion to dismiss Section 349 claim) (citations omitted).  Bait-and-switch practices fall squarely within the parameters of Section 349.  *See, e.g., Goldberg v. Manhattan Ford Lincoln-Mercury, Inc*., 129 Misc. 2d 123, 125-26 (Sup. Ct. N.Y. Co. 1985) (citing *Electrolux Corp. v. Val-Worth, Inc*., 6 N.Y.2d 556 (1959)).[1]

*First*, Beaver Mountain actually repeats its flawed argument that the disclaimers in the Purchase Agreement prevent any deception under Section 349 (which New York courts have rejected).  Beaver Mountain then insists that because the Purchase Agreement's terms were fully disclosed when Mr. Sparago signed it, he cannot claim that he was deceived.  As Mr. Sparago explains in Part I.A. below, Beaver Mountain's focus on the content of the Purchase Agreement as a full disclosure is wrong because the Amended Complaint alleges a deceptive <u>practice</u> (not a deceptive contract).  And, that practice partly involves not showing the Purchase Agreement to customers until <u>after</u> they have already started paying Beaver Mountain, <u>after</u> they have already designed their log cabin homes, and <u>after</u> Beaver Mountain has helped them interview and select a builder.

*Second*, Beaver Mountain has dissected the history of its web pages that the Amended Complaint references – arguing that it is impossible for Mr. Sparago to have seen those web pages when he started working with Beaver Mountain in 2015.  But, Part I.B. shows that in Beaver Mountain's eagerness to disprove the involvement of its website in the alleged deceptive practice, it has ignored the documents that it prepared for Mr. Sparago in 2015 (and later in 2017) that contain the same messaging and assurances as the references from Beaver Mountain's

---

[1]   Beaver Mountain appears to concede the first element (consumer-oriented conduct) by not addressing it in its motion.  Nonetheless, the Amended Complaint adequately describes that Beaver Mountain utilizes the same practice with each of its customers, which shows the broader impact on consumers at large.  *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A*., 85 N.Y.2d 20, 26 (1995) (explaining broad impact requirement met where acts complained of "potentially affect similarly situated consumers").

website.  More specifically, Beaver Mountain prepared project timelines and meeting summaries that reflect both its role as a project manager and the delayed timing of the Purchase Agreement until after several steps of the log cabin process were completed.

*Third*, notwithstanding Beaver Mountain's claim that Mr. Sparago has not shown any injury caused by the alleged deception, Part I.C. refutes that claim by pointing to the Amended Complaint's allegations that Mr. Sparago (and other customers) are now bound by the Purchase Agreement's limitations and have lost the legal right to hold Beaver Mountain accountable for construction errors – even though a project manager is typically responsible for construction errors.[2]

## A.    The Amended Complaint Provides Facts Describing Beaver Mountain's Deceptive *Practice* (Not A Deceptive Contract)

Beaver Mountain raises two points against the deceptive conduct Mr. Sparago has alleged.  It points to the disclaimers in the Purchase Agreement, and then it describes additional terms on the reverse side to extol what it calls "full disclosure."  (*See* Def's Mem. at 5-8.)  But, as the Court already pointed out, disclaimers do not undermine Section 349(a) claims alleging a deceptive <u>practice</u> (as Mr. Sparago has done here).  *See also Morrissey v. Nextel Partners, Inc.*, 72 A.D.3d 209, 214 n.5 (3d Dep't 2010) (disclaimer "does not limit the inquiry in a cause of action under General Business Law § 349, since such a claim is 'based on deceptive business practices, not on deceptive contracts'") (citing *Gaidon v. Guardian Life Ins. Co. of Amer.*, 94 N.Y.2d 330, 345 (1999); *DeAngelis v. Timberpeg E., Inc.*, 51 A.D.3d 1175, 1178 (3d Dep't

---

[2]    As this Court has recognized, whether a reasonable consumer would be misled by particular deceptive conduct or representations is typically a question of fact not appropriate for resolution through a Rule 12(b)(6) motion.  *See Kacocha v. Nestle Purina Petcare Co*., 2016 WL 4367991, at *14, *16 (S.D.N.Y. Aug. 12, 2016) (Karas, U.S.D.J.); *Lugones v. Pete and Gerry's Organic, LLC*, 2020 WL 871521, at *8-9 (S.D.N.Y. Feb. 21, 2020) (citations omitted).  Both the Amended Complaint and the exhibits annexed to Mr. Sparago's declaration contain adequate factual details to establish the legal sufficiency of the deceptive practices at the heart of Mr. Sparago's Section 349(a) claim.

2008) (rejecting the argument that "plaintiffs could not have been deceived or misled because the contract they signed contained a merger clause and specifically disclaimed liability")); *Koch v. Greenberg*, 2008 WL 4450273, at *4 (S.D.N.Y. Sept. 30, 2008) ("[l]iability may be found under Section 349 even in the presence of an explicit disclaimer like the one present here") (citations omitted).

The similarities between *DeAngelis v. Timberpeg East, Inc*. and Mr. Sparago's case against Beaver Mountain are quite striking and show why Mr. Sparago's Section 349(a) claim is similarly unaffected by the Purchase Agreement's disclaimers and other limiting language.

In *DeAngelis*, the plaintiffs attended various Timberpeg open houses after seeing local advertisements for "Timber Frame Homes."  Timberpeg personnel told the plaintiffs that John S. Shafer was an authorized Timberpeg representative serving the area in which plaintiffs sought to construct a home.  Both the Shafers and a Timberpeg manager held the Shafers out as authorized representatives of Timberpeg and assured plaintiffs that they were experienced and specially trained builders of Timberpeg homes.  "<u>Plaintiffs were also led to believe that Timberpeg would be involved in all aspects of the design and construction of the home</u> and that the Shafers would be acting under Timberpeg's supervision."  *Id*. at 1175 (emphasis added).

After these representations, plaintiffs signed a "Timberpeg Package" order form, which contained a limited warranty "<u>stating that Timberpeg was merely a supplier of design plans and building materials</u>" and did not guarantee the work of the Shafers.  *Id*. (emphasis added).  Yet, according to plaintiffs, even after signing the order form Timberpeg assured them that it would "conduct normal on site visits, remain involved with the construction of the house, and make sure [it] was properly constructed."  *Id*.  The plaintiffs later became dissatisfied with the Shafers' work and complained to Timberpeg.  Plaintiffs then terminated their contract with the Shafers

and hired a different contractor to complete the construction.

As the Third Department found, the complaint sufficiently alleged that Timberpeg engaged in consumer-oriented acts by representing itself, through an advertisement disseminated to the public in a regional magazine, flyers and open houses, as the purveyor of a "package" of products and services necessary to provide a completed Timberpeg home.  The Shafers and Timberpeg's manager represented to both plaintiffs and the public at large that the Shafers were trained, experienced and competent representatives of Timberpeg who, under Timberpeg's continuing supervision, could reproduce a Timberpeg home of the quality shown in the advertisement and at the open houses.  This conduct, however, was deceptive because Timberpeg was responsible for only the building supplies for Timberpeg homes, the Shafers did not work on Timberpeg's behalf, the Shafers were not competent builders, and plaintiffs did not receive a Timberpeg home of the quality that was represented to them.  *Id.* at 1177-78.

The Third Department rejected Timberpeg's argument (the same argument that Beaver Mountain makes here) that plaintiffs could not have been deceived or misled because the contract they signed contained a merger clause and specifically disclaimed liability for the performance of the representative who assembles the home.  The court explained that these disclaimers are "not determinative of plaintiffs' [General Business Law §] 349 claims, which are based on deceptive business <u>practices</u>, not on deceptive contracts."  *Id.* at 1178 (emphasis added) (citation omitted).  Likewise, Beaver Mountain's disclaimers in the Purchase Agreement (or on its website) do not undermine Mr. Sparago's Section 349 claim because Beaver Mountain's bait-and-switch <u>practice</u> is deceptive.

Also helpful is *People ex rel. Schneiderman v. One Source Networking, Inc.*, 125 A.D.3d 1354 (4th Dep't 2015).  Like in *Timberpeg*, the court in *OneSource Networking* rejected the

defendant's use of disclosures as "inadequate to dispel the deceptiveness of the sales practice." *Id*. at 1357. At the outset, OneSource employees discussed the loans at issue with customers over the telephone, telling them that a warranty was required to obtain a loan. The court noted that this "was the only information that the consumers obtained about the warranties until they signed the paperwork at their closings." *Id*. None of the customers was given any paperwork to review prior to their loan closings (just as Beaver Mountain customers are not given the Purchase Agreement until well into the log cabin process). But, at the closing, loan purchasers were told in writing (for the first time and using different terminology) that a warranty was not actually required. The court rejected OneSource's defenses because the loan customers' Section 349 claim was "based on One Source's <u>practice</u> of telling consumers verbally that a warranty was essentially a precondition to obtaining a loan when in fact that was not the case." *Id*. (citation omitted). This is akin to Mr. Sparago's Section 349 claim because Beaver Mountain tells its customers at the outset that it will manage their project completely, but it later provides different information in the Purchase Agreement after customers have spent months working with Beaver Mountain and have already paid Beaver Mountain substantial amounts toward their log cabins.

Beaver Mountain cites a series of cases rejecting claims of deception where there has been "full disclosure." (*See* Def's Mem. at 5-8.) But, those cases are not relevant here because in each of those cases, the consumer was actually given full information <u>before</u> moving forward with the transaction (unlike here). *See, e.g., Lebovitz v. Dow Jones and Co*., 508 Fed. App'x 83, 85 (2d Cir. 2013) (Section 349 claim failed because Dow Jones had fully disclosed to subscribers <u>before</u> they prepaid their subscriptions that Dow Jones had the discretion to change the services being offered). The remainder of Beaver Mountain's citations on pages 5 through 8 of its moving memorandum stand for the same proposition that full disclosure prior to acceptance by a

consumer cannot be deceptive.

Beaver Mountain overlooks one significant point: the Amended Complaint alleges that consumers like Mr. Sparago and others were <u>not</u> given full disclosure prior to acceptance. The Section 349(a) claim alleges Beaver Mountain's deceptive <u>practice</u> (not its deceptive contract) because by the time consumers like Mr. Sparago sign the Purchase Agreement, they have already spent months (at least) (i) paying multiple deposits to Beaver Mountain, (ii) meeting with Beaver Mountain to plan and to design the log cabin, (iii) working with Beaver Mountain to meet with potential builders, and (iv) meeting with Beaver Mountain to analyze the potential builders' respective bids and to select a builder. All of this happens between the consumers and Beaver Mountain <u>before</u> they are given the Purchase Agreement to sign. Beaver Mountain's customers are not given the Purchase Agreement at the very beginning of the relationship, and they only see a copy once they are at least halfway through the process with Beaver Mountain as project manager and after the customers have already paid Beaver Mountain cash deposits.

Beaver Mountain spills considerable ink (over two pages) describing everything that the Purchase Agreement tells customers – attempting to paint a picture of transparency and full disclosure. (*See* Def's Mem. at 6-8.) But, Beaver Mountain's attack completely misses the point of Mr. Sparago's deceptive practices claim: the issue is about <u>when</u> customers are first given the Purchase Agreement relative to the overall log cabin planning and building process that Beaver Mountain oversees for the customers. Here, the deceptive practice is the timing of when customers first have a chance to learn that Beaver Mountain is merely a supplier of materials only. As the Amended Complaint alleges, that timing is <u>after</u> customers are well into their dealings with Beaver Mountain and well after they have already paid Beaver Mountain several deposit installments toward the log cabin. (*See* Am. Compl. ¶¶ 135-36.) That is certainly <u>not</u>

full disclosure prior to acceptance.  *Cf. Morrissey*, 72 A.D.3d at 214-15.

Beaver Mountain's disclaimers and purported disclosures are a part of the deceptive practice that Mr. Sparago alleges, and they provide no cover for Beaver Mountain to evade Section 349(a) liability.[3]

**B.**     **Beaver Mountain Ignores The Dozens Of Documents It Gave To Mr. Sparago And Misses The Point Of The Amended Complaint's References To Beaver Mountain's Website**

Beyond pretending that there was full disclosure to its customers, Beaver Mountain ignores some of its own documents that it provided to Mr. Sparago throughout the log cabin process.  Fixated instead on its website, Beaver Mountain overlooks that these documents contain the same deceptive statements and impressions as Beaver Mountain's website.

More specifically, Beaver Mountain created a "Project Time Line" for Mr. Sparago (which was also annexed as Exhibit 2 to the Amended Complaint).  The Beaver Mountain "Project Time Line" contains bullet points of the same basic steps currently shown on Beaver Mountain's website and in the same basic order.  (A copy of the "Project Time Line" is also annexed as Exhibit 1 to the Sparago Declaration submitted herewith.)  The "Project Time Line" lists the following steps to the Beaver Mountain process:

- Design Consultation – Design Process Begins:                11/06/15

- Approve Home Design, Budget, Schedule & payment:        9/30/17 ($6500.00)

- Builder Selections and Select Financing:                Between 11/1/17 – 11/15/17

---

[3]     Beaver Mountain also argues that promissory statements cannot support a Section 349(a) claim, but nothing in the Amended Complaint is promissory.  A promissory statement is something like:  "You will love your log cabin for years to come."  But, that type of statement is very different from Beaver Mountain's assurances to customers that it will handle the log cabin project from start to finish, which certainly does support a Section 349(a) claim.  Despite Beaver Mountain's suggestion, there is no puffery in the Amended Complaint.

- Finalize Home Plans, Total Investment & Building Schedule:                                     Between 12/1/17 – 12/15/17

- Order Home, <u>Purchase Agreement</u>, next payment:                     12/15/17

- Custom Home Production process begins and next payment:                                                6/14/18

- Beaver Mountain Delivery and Final Payment – Construction Begins:                                         9/6/18

- Delivery of Interior Materials – Construction Continues:             As Needed

- Proposed Move In, Relax and Enjoy Your New Home:

(Sparago Decl. Exh. 1) (emphasis added).  Critically, just like Beaver Mountain's current website, this "Project Time Line" shows that the customer does not sign the Purchase Agreement until <u>after</u> the design and planning phases, after financing, after builder selections, and after at least one sizeable payment to Beaver Mountain of $6,500.  (Sparago Decl. Exh. 1.)

These steps are very similar to the ten steps listed on Beaver Mountain's website, which current and potential customers can see.  And, these various steps – showing the <u>entirety</u> of the project including design and planning, builder selections, financing, materials, and construction – align with Beaver Mountain's role as the project manager.  If Beaver Mountain really were a supplier of materials only, it would not have created the "Project Time Line" for Mr. Sparago and would not have managed the entire log cabin process for Mr. Sparago.  Instead, a supplier of materials only would have spent its time limited to the ordering and delivery of the materials (not on design, builder selections and construction timelines).

Of course, this Beaver Mountain document is not alone.  Beaver Mountain sent Mr. Sparago a "Sparago Site Visit Summary – November 6, 2015" that listed "John Lanner, Design Consultant & <u>Project Coordinator</u>" as one of the attendees.  (Sparago Decl. Exh. 2) (emphasis added).  Again, a supplier of materials only would not describe one of its employees as the "Project Coordinator."  The November 6, 2015 summary also notes that Mr. Sparago and

12

Beaver Mountain discussed a forthcoming review of "preliminary <u>turnkey</u> pricing" and "[d]iscussed builder candidates." (*Id.*) (emphasis added). The "turnkey" reference corroborates the Amended Complaint's allegations that Beaver Mountain was a project manager that promised to deliver a turnkey log cabin completely finished. And, this summary also shows Beaver Mountain participating in discussions about potential builder candidates – also not something that a supplier of materials would have done.

A December 11, 2015 "Sparago Design Review Summary" from Beaver Mountain again described attendee John Lanner as the "Project Coordinator" and again included a discussion about builder introductions. (Sparago Decl. Exh. 3.) Another "Sparago Design Review Summary" from September 16, 2017 reflects as "Action Items" another payment from Mr. Sparago and builder introductions with Beaver Mountain's involvement set for later that fall. (Sparago Decl. Exh. 4.) A separate "Sparago Builder Introductions Summary" from November 10, 2017 was also attended by John Lanner, who identified himself as the "Project Coordinator," and Chris Weyer, Beaver Mountain's Regional Building Consultant. (Sparago Decl. Exh. 5.) Notably, following the meetings with the three builder candidates, the "Action Items" show that only Beaver Mountain was responsible for the builder candidate follow-ups. There are no action items for Mr. Sparago concerning the builder selections. Again, were Beaver Mountain merely a supplier of materials, it would not have immersed itself in leading the builder selection process for its customers.

Following Beaver Mountain's coordination of the builders' bidding process, Beaver Mountain prepared a detailed analysis of each bid and assisted Mr. Sparago with the selection of the builder. The December 6, 2017 cover letter from John Lanner to Mr. Sparago and his wife notes that he was "excited about the progress <u>we</u> have made over the past few months and

remain confident <u>we</u> are getting closer to achieving your dream home." (Sparago Decl. Exh. 6) (emphasis added). A supplier of materials only would not have analyzed the builders' bids and would not have made recommendations to its customers.

Equally noteworthy is Beaver Mountain's November 14, 2017 letter to Max Dutcher, one of the builder candidates. (Sparago Decl. Exh. 7.) Beaver Mountain's letter to Mr. Dutcher provides instructions on how he should submit a bid so that Beaver Mountain can "<u>assist the Sparagos through the bid process</u>." (*Id.*) (emphasis added). And, Beaver Mountain continues: "Finally, as part of <u>our services</u> to Mr. and Mrs. Sparago and to meet our goal at Beaver Mountain to save our clients time, <u>it is imperative for you to coordinate this process through our office</u>." *Id.* (emphasis added). In a letter that Beaver Mountain copied to Mr. Sparago, Beaver Mountain specifically instructed the builder candidates that it was "imperative" for them only to work through Beaver Mountain.

Another page contained in Beaver Mountain's detailed bid analysis for Mr. Sparago contains a summary of "Home Materials & <u>Services</u>" and details below in two separate groupings the "New Home Planning & Design Services" and the "Custom Home Materials & Services" that Beaver Mountain was providing to Mr. Sparago. (Sparago Decl. Exh. 8) (emphasis added). Again, Beaver Mountain included as a part of its "New Home Planning & Design Services" "Builder Recruitment & Bid Analysis" and "Total Investment & Project Review." (*Id.*) And, these are listed <u>in addition to</u> the materials that Beaver Mountain indicates it will be supplying. (*Id.*)

Beaver Mountain's payment receipts to Mr. Sparago also show that he made at least three sizeable payments to Beaver Mountain <u>before</u> he signed the Purchase Agreement on December 16, 2017. (Sparago Decl. Exh. 9.) Mr. Sparago made a non-refundable payment of $3,500 to

Beaver Mountain on November 5, 2015, a $6,500 pre-manufacturing payment to Beaver

Mountain on September 26, 2017, and another pre-manufacturing payment of $16,000 on

December 8, 2017.  By the time Mr. Sparago first saw and then signed the Purchase Agreement

(in which Beaver Mountain claims – for the first time – that it is merely a supplier of materials),

he had already paid Beaver Mountain at least $26,000.  He had already worked with Beaver

Mountain to meet with three potential builders for the project.  This is contrary to the "full

disclosure" that Beaver Mountain touts in its moving memorandum.

Instead of addressing its own "Project Time Line" (Sparago Dec. Exh. 1) and the other

documents it sent to Mr. Sparago, Beaver Mountain spends considerable effort detailing why

Mr. Sparago could not have seen the particular website references in the Amended Complaint.

Beaver Mountain appears to have become so engrossed in showing that Mr. Sparago's website

references are irrelevant that it completely ignored its own Project Time Line (referenced in and

annexed to the Amended Complaint) and its other documents that paint the same clear picture of

Beaver Mountain as the project manager.

The fact that Mr. Sparago may not have seen the specific versions of the web pages

referenced in the Amended Complaint does not undermine his claim for at least two reasons.

*First*, Beaver Mountain made similar statements to Mr. Sparago through other documents

besides its website that Mr. Sparago <u>did</u> see.  And *second*, the Amended Complaint includes

Beaver Mountain's current website references because it shows that Beaver Mountain's

deceptive practice is ongoing and is still directed at consumers at large – one of the elements of a

Section 349(a) claim.

Paragraphs 67 through 79 of the Amended Complaint describe a number of documents

and emails that Beaver Mountain created for or sent to Mr. Sparago – which contain similar

descriptions of Beaver Mountain's process and its involvement as a project manager as those contained on Beaver Mountain's website today.  These documents are also consistent with the exhibits annexed to Mr. Sparago's accompanying declaration.  Irrespective of whether Mr. Sparago saw Beaver Mountain's web pages as they appear today, the documents referenced in Paragraphs 67 through 79 are consistent with the misleading statements on Beaver Mountain's website and still show Beaver Mountain to be the project manager instead of merely a supplier of materials.[4]

In other words, Mr. Sparago saw these same deceptive statements and representations when he engaged Beaver Mountain in 2015 even if they were in specific documents that Beaver Mountain gave to him and not through Beaver Mountain's website.  The point is not whether a specific customer sees Beaver Mountain's website.  It is whether Beaver Mountain leads a customer to believe that Beaver Mountain is the project manager that will handle the project completely for the customer and actually helps that customer through many of the stages in the overall log cabin process – before having the customer sign the Purchase Agreement that makes Beaver Mountain merely a supplier of materials.

Beaver Mountain's website was merely one of several different sources for distributing its deceptive assurances to customers.

**C.     Mr. Sparago Has Sufficiently Alleged Damages
        Caused By Beaver Mountain's Deceptive Practice**

Beaver Mountain separately insists that Mr. Sparago has suffered no damages from Beaver Mountain's deceptive practice – mistakenly suggesting that the deception alleged here

---

[4]     Paragraphs 80 through 87 of the Amended Complaint also contain factual details and communications from Beaver Mountain corroborating its involvement in coordinating the builder selection process and its expertise about the competence and availability of local builders.  Beaver Mountain similarly ignores these paragraphs in its motion.

doubles as both the conduct and the injury.  The Amended Complaint alleges harm that is distinct from Beaver Mountain's deception, unlike in Beaver Mountain's citation to *Amalfitano v. NBTY, Inc.*, 128 A.D.3d 743 (2d Dep't 2015), where the only harm alleged was the fact that the plaintiff had been deceived.

More specifically, Paragraphs 139 through 141 of the Amended Complaint describe that Mr. Sparago (and other customers like him) have been harmed by Beaver Mountain's deceptive conduct because they are now purportedly bound by terms in the Purchase Agreement that are wholly inconsistent with the advertised lure that Beaver Mountain would be there with them "every step of the way" or would coordinate the entire project for a customer as a turnkey project.  Here, Mr. Sparago now suffers from a limitation of Beaver Mountain's liability that he would otherwise be able to assert against a typical construction project manager.  The Amended Complaint specifically alleges that the provisions of Paragraph 10 of the Purchase Agreement prevent Mr. Sparago from holding Beaver Mountain even partly responsible for the construction errors as the project manager.

Beaver Mountain's deception was the bait-and-switch – accomplished by the timing of when it gave customers the Purchase Agreement to sign.  Mr. Sparago's damages include his loss of a legal right to sue Beaver Mountain for the construction errors it was (or should have been) overseeing as the project manager.  Courts have "recognize[d] several types of harm which might be cognizable as a legal injury, such as physical, emotional, pecuniary or reputational harm, or the impairment of a recognized legal right."  *Michelo v. National Collegiate Student Loan Trust 2007-2*, 419 F. Supp. 3d 668, 706 (S.D.N.Y. 2019) (emphasis added) (citations omitted).

Paragraph 14 of the Purchase Agreement does not limit Mr. Sparago's damages because

17

Paragraph 14's limitations expressly apply to "loss *[sic]* revenues, lost profits or other <u>indirect</u>, <u>consequential</u>, <u>special</u>, or punitive losses or damages. (Sweeney Decl. Exh. A Exh. 1 ¶ 14) (emphasis added). Consequential damages are losses that do not flow directly and immediately from an injurious act but that result indirectly from the act. *See generally* N.Y. U.C.C. § 2-715(2). The damages Mr. Sparago alleged in the Amended Complaint are all direct damages proximately caused by Beaver Mountain's deceptive practice.

For all of these reasons, Mr. Sparago's Section 349(a) claim should be sustained.

## II.

### MR. SPARAGO'S NEGLIGENT MISREPRESENTATION CLAIM IS LEGALLY SUFFICIENT AND SHOULD NOT BE DISMISSED

The Amended Complaint adequately alleges facts showing (i) the existence of a special or privity-like relationship imposing a duty on Beaver Mountain to impart correct information to Mr. Sparago, (ii) that the information given to Mr. Sparago was incorrect, and (iii) Mr. Sparago's reasonable reliance on the information. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012). As Judge Scheindlin explained, "under New York negligent misrepresentation law, the question is not whether an affirmative misrepresentation can be attributed to a defendant, but whether a defendant breached a duty to provide a plaintiff with accurate information." *Id*.

Mr. Sparago's negligent misrepresentation claim centers around Beaver Mountain's failure to disclose to him the negative customer reviews about Robert Beechel that Beaver Mountain's manager knew about and with which he had been personally involved.

### A.    Beaver Mountain Owed Mr. Sparago A Duty Of Complete And Accurate Disclosure For Two Independent Reasons

Beaver Mountain first claims that it had no duty to disclose the negative Robert Beechel

complaints that Mr. Weyer knew about in 2017.  A duty to disclose typically stems from actual

privity of contract or a relationship so close as to approach that of privity.  *See Parrott v.*

*Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 483 (2000).  It arises in three situations, the first and

third of which apply here:  (i) where a party has made a partial or ambiguous statement (because

a party cannot give only half of the truth); (ii) where a party has a fiduciary duty to another; or

(iii) where a party has superior knowledge not available to the other party and the party with

superior knowledge knows that the other party is acting on the basis of mistaken knowledge.  *See*

*Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 232 (S.D.N.Y.2007) (citation

omitted).

    With Mr. Sparago, Beaver Mountain had a special relationship of trust (approaching that

of privity) because it touted its expertise to him in recommending and selecting local builders

and urged him to rely on its expertise.  Beyond simply making recommendations, Beaver

Mountain and its employees like Chris Weyer shared with Mr. Sparago his assessment that

"[b]uilders are becoming more scarce as the market improves and Sullivan county sees an uptick

due to the casino's [sic] and other development in the area etc."  (Sweeney Decl. Exh. A ¶¶ 80,

81, 158-59.)  In addition, Chris Weyer was aware that Mr. Sparago asked him for negative

information or complaints about Robert Beechel because it was precisely during the time that

Beaver Mountain and Mr. Weyer were coordinating the builder selection process for

Mr. Sparago.  It would be unlikely for Mr. Weyer *not* to know Mr. Sparago was using such

information for the particular purpose of evaluating which builder to hire.  And, Mr. Weyer also

knew that Mr. Sparago would be relying on his statements and information about Robert Beechel

(again, because it was during the builder selection process, which also supplies the conduct

linking an understanding of Mr. Weyer's statement to Mr. Sparago's reliance).  *See Sykes v. RFD*

*Third Ave. 1 Assocs., LLC*, 67 A.D.3d 162, 165 (1st Dep't 2009), *aff'd*, 15 N.Y.3d 370 (2010) (citation omitted).

The Amended Complaint also shows how Mr. Sparago was justified in relying on Beaver Mountain's (and Chris Weyer's) specialized expertise and knowledge that was peculiarly within Beaver Mountain's control.  More specifically, Mr. Sparago asked Mr. Weyer for specific information about whether any other customers had complained about Robert Beechel's work. Without disclosure from Beaver Mountain, Mr. Sparago would have no practical way through ordinary diligence to discovery the information on his own.  The identities and contract information of the particular Beaver Mountain customers who had previously complained about Robert Beechel were known only to Beaver Mountain.  There were no publicly available sources for Mr. Sparago to discover the omitted information on his own because it was Beaver Mountain's proprietary information  *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996). Contrary to Beaver Mountain's assertion, Mr. Sparago's negligent misrepresentation claim does not involve the particulars of Beaver Mountain's own business practices.  Instead, the information concerned Robert Beechel and his history of negative complaints about his work.

Separately, Beaver Mountain's duty to speak also arose because Chris Weyer provided incomplete and misleading information to Mr. Sparago in response to Mr. Sparago's questions about Robert Beechel.  A party cannot provide only half of the truth.  *See Century Pacific, Inc*., 528 F. Supp. 2d at 232.  As the Amended Complaint alleges, when Mr. Sparago asked Chris Weyer (during their meeting <u>specifically</u> <u>about</u> builder introductions and the selection process) if he knew about any prior customer complaints about Robert Beechel, Mr. Weyer remained silent about the specific negative complaints he knew and with which he had been personally involved – and instead he promoted Mr. Beechel as a good builder.  Mr. Weyer's withholding of the

specific negative information Mr. Sparago asked for – at their builder introductions meeting – was partial and misleading, triggering Beaver Mountain's duty to correct its partial and misleading statement with the information Mr. Sparago specifically requested.

There are two separate bases for determining why Beaver Mountain had a duty to speak truthfully and completely to Mr. Sparago at their builder introduction meeting on November 10, 2017, each of which supports the legal sufficiency of Mr. Sparago's negligent misrepresentation claim.

**B.      The Purchase Agreement Disclaimers Do Not Impact**
**         Mr. Sparago's Reliance Before He Signed The Purchase Agreement**

Beaver Mountain next argues that because Mr. Sparago signed the Purchase Agreement before he hired Robert Beechel as his builder, Mr. Sparago cannot claim reliance on the information Mr. Weyer failed to tell him.  But, Beaver Mountain overlooks that Mr. Weyer failed to disclose to Mr. Sparago the complaints that other customers had made about Robert Beechel <u>before</u> the Purchase Agreement was signed.  And, Mr. Sparago (together with Mr. Weyer) met with all three builders for the selection process <u>before</u> the Purchase Agreement was signed.  In other words, Mr. Sparago fairly and reasonably relied on a false and misleading picture that Mr. Weyer's omissions created about Robert Beechel before he disclaimed any reliance in the Purchase Agreement.  The Amended Complaint alleges that if Mr. Weyer had provided full and accurate information to Mr. Sparago, Mr. Sparago would not have considered Robert Beechel for the project after November 10, 2017 – more than a month <u>before</u> Mr. Sparago signed the Purchase Agreement.  (*See* Sweeney Decl. Exh. A ¶ 100.)

The circumstances here are quite different from what Beaver Mountain insinuates because Mr. Sparago's reliance pre-dates his entry into the Purchase Agreement – even though he did not complete the hiring of Robert Beechel until after it was signed.  Mr. Sparago

reasonably relied on the incomplete and inaccurate impressions about Robert Beechel that
Beaver Mountain (through Chris Weyer) created.

C.     **The Amended Complaint Satisfies Rule 9(b)'s Heightened Pleading Standards**

Irrespective of whether Rule 9(b) applies to negligent misrepresentation claims, the
Amended Complaint satisfies Rule 9(b) anyway.  In instances where the alleged fraud is
premised on an omission, a plaintiff must specify the person responsible for the failure to speak,
the context of the omission, and the manner in which the omission misled the plaintiff." *Solutia
Inc. v. FMC Corp*., 456 F. Supp. 2d 429, 449-50 (S.D.N.Y. 2006) (citing *Odyssey Re (London)
Ltd. v. Stirling Cooke Brown Holdings Ltd*., 85 F. Supp. 2d 282, 294 (S.D.N.Y. 2000)).

The Amended Complaint alleges that Chris Weyer, a Beaver Mountain Regional Sales
Manager, was the person responsible for the failure to speak. (*See* Sweeney Decl. Exh. A ¶¶ 91-
94.)  The Amended Complaint also alleges specifically that on November 10, 2017 during a
meeting between Mr. Weyer and Mr. Sparago, Mr. Weyer failed to disclose to Mr. Sparago the
complaints made by other Beaver Mountain customers about Robert Beechel's work (which
Mr. Weyer had been personally aware of and had received directly).  (*Id*.)  The Amended
Complaint goes even further than simply stating "complaints" and explains in detail that "Beaver
Mountain knew that Robert Beechel took three times longer to complete a job (over 12 months)
that should have taken only four months.  And, Beaver Mountain knew that Robert Beechel's
work for other customers was sub-par.  This information was material and would have led
Mr. Sparago to turn to the other two builders who had also bid on the project.  (*Id*. ¶¶ 100, 162-
63.)  The Amended Complaint also details specifically that Mr. Sparago was misled by
Mr. Weyer's omission because he hired Robert Beechel as his builder, who then caused a
significant amount of damage through his multiple, substantial construction errors.  (*Id*. ¶¶ 102-

103.)

The Amended Complaint's factual detail differs meaningfully from the example Beaver

Mountain cites in *Odyssey Re (London) Ltd*., 85 F. Supp. 2d 282.  Odyssey's pleading alleged

that "the defendants collectively concealed from Odyssey <u>information</u> concerning the loss

history and certain unprofitability of these transactions," but plaintiffs may not maintain an

action in fraud by simply alleging a failure to disclose 'information.'"  *Id*. at 294 (emphasis

added) (noting further that plaintiffs could not make such an unspecified allegation against

defendants collectively).  Mr. Sparago's allegations here spell out precisely what "information"

Mr. Weyer withheld from him on November 10, 2017:  that Robert Beechel took three times

longer to complete a job (over 12 months) that should have taken only four months and that

Robert Beechel's work for other customers was considered sub-par.  The Amended Complaint is

sufficiently particular to satisfy Rule 9(b)'s pleading standards.

### III.

### MR. SPARAGO'S NEGLIGENCE CLAIM IS LEGALLY SUFFICIENT

Beaver Mountain also mistakenly argues that Mr. Sparago's negligence claim overlaps

completely with his negligent misrepresentation claim.  But, the Amended Complaint shows that

while the negligent misrepresentation claim focuses on the omission of specific information

about Robert Beechel in response to Mr. Sparago's direct questions to Mr. Weyer, Mr. Sparago's

negligence claim instead focuses on Beaver Mountain's affirmative conduct in recommending

Robert Beechel when it should have known he was problematic as a contractor.

The negligence claim establishes that Beaver Mountain was the project manager for

Mr. Sparago's log cabin project, which precipitated Beaver Mountain's duty as the project

manager to perform properly in that role.  (*See* Sweeney Decl. Exh. A ¶ 146.)  Beaver Mountain

assures its customers (including Mr. Sparago) that it will help customers find a reputable builder for their log cabin project.  As a matter of law, Beaver Mountain had a duty of care to Mr. Sparago to perform the role of project manager satisfactorily.  By recommending a sub-par contractor to Mr. Sparago when it should have known better, Beaver Mountain breached its duty of care and directly caused Mr. Sparago damages when the contractor (known to be sub-par) damaged Mr. Sparago's log cabin and surrounding property.  (*Id.* ¶¶ 145, 147.)

Mr. Sparago's negligence claim is unhampered by the Purchase Agreement disclaimers for the same reasons as his negligent misrepresentation claim.  Beaver Mountain's recommendation of Robert Beechel to Mr. Sparago took place starting in November 2017 – well before Mr. Sparago signed the Purchase Agreement.  During November 2017, Beaver Mountain failed to adhere to its duties as a project manager by managing the builder selection properly prior to the entry into the Purchase Agreement.

The facts alleged in the Amended Complaint sufficiently and separately state a negligence claim against Beaver Mountain.  Mr. Sparago's negligence claim should be sustained.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, should be denied in its entirety.

Dated:   White Plains, New York
         July 11, 2020

                                        BRICK LAW PLLC


                                        By:  ____/s/  Brian H. Brick_____
                                               Brian H. Brick, Esq.

                                        2 Milford Close
                                        White Plains, New York  10606
                                        (917) 696-3430
                                        brianbrick@bricklawpllc.com

                                        *Attorneys for Plaintiff*